[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 03, 2001
THOMAS K. KAHN
CLERK

_____

No.  00-15927

_____

D.C. Docket No. 00-00865-CV-CB-L

CRAIG PITTMAN, GREG SHAW, et al.,

Plaintiffs-Appellees,
Cross-Appellants,

versus

RANDALL L. COLE, in his official capacity as
Commissioner of the Alabama Judicial Inquiry Commission,
NORMAN E. WALDROP, JR., et al.,

Defendants-Appellants,
Cross-Appellees.

_____

Appeals from the United States District Court
for the Southern District of Alabama

_____

**(October 3, 2001)**

Before CARNES and MARCUS, Circuit Judges, and PROPST*, District Judge.

_____

*Honorable Robert B. Propst, District Judge for the Northern District of Alabama, sitting by designation.

CARNES, Circuit Judge:

The plaintiffs in this case, three candidates for Alabama judgeships and the Christian Coalition of Alabama, brought this action seeking to enjoin the enforcement of advisory opinions promulgated by the Alabama Judicial Inquiry Commission ("JIC") and the Alabama State Bar's Office of General Counsel concerning whether judicial candidates could, without violating applicable ethics rules, respond to a questionnaire created by the Christian Coalition. The district court granted a preliminary injunction against enforcement of the policies and the related canons of ethics. See Pittman v. Cole, 117 F. Supp. 2d 1285, 1316-17 (S. D. Ala. 2000). However, the court declined to address whether there was a "substantial likelihood of success on the merits," and it abstained on the merits of the claims hoping that state courts would resolve unsettled questions of law. Id. at 1311-17.

The defendants have appealed contending that the district court erred in holding the plaintiffs' claims are justiciable and abused its discretion by entering the preliminary injunction, while the plaintiffs have cross-appealed contending the district court abused its discretion by abstaining from deciding the merits. For the reasons that follow, we vacate the district court's order and remand with instructions for it to dismiss Defendant J. Anthony McLain, the Bar's General

Counsel, and to certify relevant unsettled questions of state law to the Alabama Supreme Court.

## I. BACKGROUND

### A. FACTS

Plaintiff Christian Coalition is a non-profit corporation that wanted to (and ultimately did) publish a voter guide before the November 7, 2000 general election informing voters about the views of Alabama judicial candidates. In order to obtain information for the voter guide, the Christian Coalition prepared a 30-item questionnaire and distributed it to all Alabama judicial candidates on August 30, 2000, with instructions that the completed questionnaire be returned by September 10, 2000. Plaintiffs Craig Pittman, Alice Martin, and Greg Shaw were candidates seeking election to judicial office in Alabama in the 2000 general election who received the Christian Coalition's questionnaire and desired to complete and return it.

The questionnaire asked judicial candidates to provide one-word answers to a series of questions on issues such as: whether birth control products should be dispensed in schools; whether a judge's religious beliefs should play a role in deciding cases; whether an unborn child is a human being with a soul from its creator; whether gambling should be legalized in Alabama; whether the candidate

3

supported firearm registration and handgun control; whether marital benefits should be extended to domestic partners; whether the candidate supported constitutional amendments to permit prayer in schools and at school sporting events and to protect the flag; whether the Alabama Supreme Court had done an adequate job of preventing excessive punitive damage awards; and whether the future of the jury system was jeopardized by limitations on jury awards. Each of the thirty questions could be answered only in one of four ways:  1) Agree,  2) Disagree,  3) Undecided  or  4) Decline.[1]  The cover letter explained that any additional narrative or explanation provided by the candidate would be neither useful to, nor used by, the Christian Coalition in preparing its voter guide.

On September 8, 2000, the JIC issued Advisory Opinion 00-763 in response to inquiries by two sitting judges who were running for re-election in the 2000 general election (neither of whom is a plaintiff in this lawsuit) concerning whether the candidates could respond to the Christian Coalition questionnaire without violating the Alabama Canons of Judicial Ethics. The JIC, which is the body vested by the Alabama Constitution with authority to enforce the Canons of Judicial Ethics against Alabama judges, issued its advisory opinion pursuant to Rule 17 of

---

[1]The option "Decline" was followed by an asterisk, with the following notation: "This blank is provided throughout the Questionnaire in the event candidate believes, based on a good faith, reasonable construction of the Canons of Judicial Ethics, that he or she must decline to respond to a particular issue."

4

the JIC's Rules of Procedure. That rule provides the JIC with authority to render advisory opinions to judges about whether a specified action would constitute a violation of the Canons of Judicial Ethics. The JIC's advisory opinions may be considered by any court, but they do not bind the Alabama courts in interpreting and applying the canons.[2]

In its advisory opinion, the JIC stated that some of the questions in the questionnaire violated Canon 2(A),[3] some violated Canons 3(A)(1) and (6),[4] and some violated Canon 7(B)(1)(c),[5] but the opinion did not specify which questions

---

[2]While the JIC has authority to receive complaints from citizens, to conduct investigations, to file formal complaints in the Alabama Court of the Judiciary, and to prosecute those complaints before the Court of the Judiciary, it does not adjudicate complaints and cannot discipline judges. Ala. Const. Amend. No. 581 § 6.17.

[3]Canon 2(A) provides: "A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

[4]Canon 3(A) provides, in part, that:

(1) A judge should be faithful to the law and maintain professional competence in it. He should be unswayed by partisan interests, public clamor, or fear of criticism.

. . .

(6) A judge should abstain from public comment about a pending or impending proceeding in any court, and should require similar abstention on the part of court personnel subject to his direction and control. This subsection does not prohibit judges from making public statements in the course of their official duties or from explaining for public information the procedures of the court.

Ala. Canons Jud. Ethics 3(A)(1) & (6).

[5]Canon 7(B)(1)(c) states: "A candidate for judicial office filled either by public election between competing candidates or on the basis of a merit system election . . . [s]hall not make any

5

violated which particular canons. The opinion also generally cautioned that candidates could not make statements "that would tend to embroil the judicial candidate in political debate." After taking note of the limited nature of the one-word answers the questionnaire insisted upon, the advisory opinion concluded that under the Canons of Judicial Ethics candidates could not answer any of the questions except by checking the box "Decline." The opinion did not discuss whether other, less constrained, forms of communications with respect to the issues covered in the questionnaire would violate the canons.

On September 11, 2000, a day after the deadline for responding to the Christian Coalition questionnaire, Gilbert Kendrick, an assistant general counsel in the Bar's Office of General Counsel, issued an informal advisory opinion in response to a confidential request from an attorney (who is not a party to this action) licensed to practice law in the State of Alabama. That informal opinion began by stating:

> In response to your request, I am providing you the following which is an informal opinion of the Office of General Counsel and is not binding on the Disciplinary Commission of the Alabama State Bar.

promise of conduct in office other than the faithful and impartial performance of the duties of the office; shall not announce in advance the candidate's conclusions of law on pending litigation; and shall not misrepresent his or her identity, qualification, present position, or other fact."

6

The opinion noted that Rule 8.2 of the Bar's Rules of Professional Conduct provides that "[a] lawyer who is a candidate for judicial office shall comply with the applicable provisions of the Alabama Canons of Judicial Ethics, and failure to so comply with [those canons] shall constitute a violation of this disciplinary rule."[6] The advisory opinion stated that "most, if not all of the questions presented request you to make a promise of conduct in office or to announce in advance your conclusions of law on issues you would be called upon to decide as a judge" in violation of Canon 7(B)(1)(c). On that basis, Kendrick's informal advisory opinion concluded that attorneys are "ethically prohibited" from answering any "such questions."

The Bar notes that Kendrick's September 11, 2000 advisory opinion was not issued pursuant to Rule 18 of the Alabama Bar Association's Rules of Disciplinary Procedure, which provides:

> If, before engaging in a particular course of conduct, a lawyer makes a full and fair disclosure, in writing, to the General Counsel, and receives therefrom a written opinion, concurred in by the

---

[6]Because the only Rule of Professional Conduct cited by Kendrick was one incorporating the Canons of Judicial Ethics and applying the canons to attorneys who are candidates for judicial office, his informal advisory opinion – like the JIC opinion – only concerned the content of the Alabama Canons of Judicial Ethics. Accordingly, for the remainder of this opinion, we will discuss the application of the canons by both the JIC and the Bar, but, in the case of the Bar, we are technically referring to the application of Rule 8.2(b) of the Bar's Rules of Professional Conduct, which incorporates those canons.

Disciplinary Commission, that the proposed conduct is permissible, such conduct shall not be subject to disciplinary action.

None of the plaintiffs availed themselves of this administrative procedure for obtaining an official advisory opinions from the Disciplinary Commission of the Alabama State Bar before filing this lawsuit, nor have they since.

According to the plaintiffs, as a result of the advisory opinions issued by the JIC and the Bar's general counsel, several judicial candidates refused to answer the Christian Coalition's questionnaire at all, despite their expressed desire to do so. Several other judicial candidates who had answered the questionnaire requested that the Christian Coalition not publish the answers they had given. After the advisory opinions were issued, the Christian Coalition voluntarily chose to eliminate fifteen of the thirty questions from its questionnaire, but neither the JIC nor the Bar were asked to reconsider the advisory opinions in light of this revision.

## B. PROCEDURAL HISTORY

On September 26, 2000, the plaintiffs filed this action under 42 U.S.C. § 1983 raising claims under the First and Fourteenth Amendments. They sought a declaration that the state's "enforcement policies," embodied in the two advisory opinions, were overbroad in violation of the First Amendment, and an injunction against enforcement of those policies. The lawsuit originally named

as defendants all but one of the members of the JIC in their official capacities; Anthony McClain, the general counsel of the Bar, in his official capacity; and each of the members of the Bar's Disciplinary Commission in their official capacities. The plaintiffs eventually agreed to dismiss each of the Bar Disciplinary Commission members as defendants. Judge John Crawley, the one JIC member who was not named as a defendant, was permitted to intervene as a plaintiff. Each of the defendants moved to dismiss the case.

On October 10, 2000, the district court held a hearing on the plaintiffs' preliminary injunction motion. One week later, the court issued its order denying the defendants' motions to dismiss, granting a preliminary injunction, and abstaining from reaching the merits. The court enjoined the defendants:

> [F]rom enforcing or attempting to enforce the JIC and/or [Bar] Advisory Opinions, or ALABAMA CANONS OF JUDICIAL ETHICS, against the Plaintiffs, for responding to, and/or receiving and publishing the [Christian Coalition] fifteen (15) question survey questionnaire, so that these Defendants are prohibited from commencing or conducting any investigations or initiating complaints concerning any State of Alabama judicial candidate for the November 2000 election, as well as from initiating proceedings regarding disciplinary procedures administered by the Alabama Disciplinary Commission against any such candidate.

Pittman, 117 F. Supp. 2d at 1316-17 (capitals in original). The district court stayed all further proceedings and retained jurisdiction to ensure compliance with its order. Id. at 1317. However, the court expressed its opinion that its

9

order "should obviate the need for further proceedings," such as a hearing on the merits.  Id.

On October 20, 2000, the defendants filed motions for reconsideration and clarification, which the district court denied on October 24, 2000.  In its order denying the defendants' motions, however, the court agreed with the defendants on several points, including their position that answering some of the Christian Coalition questions might raise serious ethical concerns under the Canons of Judicial Ethics for judicial candidates.  The court also acknowledged that it had not addressed the constitutionality of the canons.   The district court clarified that:

> [T]he intent [of its earlier order and preliminary injunction] was to conclusively provide the opportunity for both parties to further pursue this matter at the state level, to obtain a determination as to the merits of this claim and to address the constitutionality of the JIC and [Bar] Advisory opinions interpreting the CANONS "as-applied" to the fifteen (15) question [Christian Coalition] survey questionnaire.

(capitals in original). In response to the defendants' argument that the injunction was in fact permanent, rather than preliminary in nature, the court stated that:

> As this Court took great effort to specify in its Order, the preliminary injunction remains if no subsequent action is pursued at the state level to obtain a determination on the merits of this case, as due to the present posture of this matter, the Plaintiffs have

> had their FIRST AMENDMENT rights chilled by the Defendants'
> Advisory Opinions so that the preliminary injunction is the proper,
> but limited remedy, because the Plaintiffs have "raised substantial
> grounds presenting grounds for litigation." As such, the
> preliminary injunction will remain in force to allow this Court to
> enforce its own Order until such time as there is state resolution of
> these issues. Once a final decision at the state level is made and
> presented to this Court, then there may well be further reason, or
> not, as the case may be, for the preliminary injunction to remain.
> However, this is a question for another day.

(capitals in original). Neither side filed any action in state court relating to the

matter.

Both sides have appealed, the defendants being unhappy with the court's

having entered an injunction, and the plaintiffs being unhappy with the court's

having abstained from deciding the merits.

## II. DISCUSSION

The parties present three basic sets of issues on appeal. First, the

defendants argue that the plaintiffs have no standing to bring their claims

against the defendants and that the claims are not ripe for adjudication. Second,

the plaintiffs maintain that the district court erred by abstaining instead of

deciding the merits of their claims. Finally, the defendants argue that the

court's preliminary injunction order was improper because the court did not

first find that the plaintiffs had a "substantial likelihood of success on the

11

merits" and because the injunction is overbroad. We will consider each of these issues in turn.

## A. JUSTICIABILITY: RIPENESS AND STANDING

The defendants contend that this case should be dismissed because the plaintiffs have no standing to bring their claims and because, at least with respect to the claims against the Bar, their claims are not ripe. Both ripeness and standing are doctrines relating to the justiciability of the plaintiffs' claims. We have noted that "[j]usticiability . . . encompasses both constitutional and prudential concerns." Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale, 922 F.2d 756, 759 (11th Cir. 1991). In that decision we explained:

> The constitutional aspect of the justiciability analysis focuses on whether an actual "case or controversy" as required by Article III is presented, while the prudential part asks whether it is appropriate for this case to be litigated in a federal court by these parties at this time.

Id. at 759-60. For reasons relating more to prudential concerns, we conclude that the claims against the Bar are insufficiently ripe to be litigated. We also conclude, however, that the plaintiffs do have standing to pursue their claims against the JIC.

### 1. Ripeness

Only the Bar has raised a ripeness argument, and it arises from the nature of the advisory opinion that underlies the plaintiffs' claims against it. That opinion was an informal one issued by the Office of General Counsel, as distinguished from a more formal one issued, or reviewed and approved, by the Disciplinary Commission pursuant to Rule 18 of the Bar's Rules of Disciplinary Procedure. Rule 18 provides an administrative procedure the plaintiffs could have used to obtain a formal advisory opinion from the Disciplinary Commission (comparable in formality to the one issued by the JIC), which might have obviated the need for any litigation. Instead of seeking to resolve or crystallize matters that way, the plaintiffs charged ahead into court with this lawsuit.

Similar to the standing doctrine, "[t]he ripeness doctrine involves consideration of both jurisdictional and prudential concerns." Digital Properties, Inc. v. City of Plantation, 121 F.3d 586, 589 (11th Cir. 1997). We have described the "ripeness" doctrine as follows:

> The ripeness doctrine prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements. . . . To determine whether a claim is ripe we must evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.

13

Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1315 (11th Cir. 2000) (citations and quotations omitted). In other words, "[c]ourts must resolve . . . whether the claim is sufficiently mature, and the issues sufficiently defined and concrete, to permit effective decisionmaking by the court." Digital, 121 F.3d at 589 (citations and quotations omitted).

As guidance in considering and applying the "fitness" and "hardship" prongs of the ripeness analysis, the Supreme Court has indicated that we must consider the following factors:

> (1) whether delayed review would cause hardship to the plaintiffs;
> (2) whether judicial intervention would inappropriately interfere
> with further administrative action; and (3) whether the courts
> would benefit from further factual development of the issues
> presented.

Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 733, 118 S. Ct. 1665, 1670 (1998). See also Ala. Power Co. v. Fed. Energy Regulatory Comm'n, 685 F.2d 1311, 1315 (11th Cir. 1982) (listing four similar factors).

We begin by considering the second and third of the Ohio Forestry factors – the need for factual development, and the interference with administrative procedures – both of which relate to the fitness of the plaintiffs' claims for adjudication at this time. We have noted that claims are less likely to be considered "fit" for adjudication when they venture beyond purely legal

14

issues or when they require "speculation about contingent future events." Cheffer v. Reno, 55 F.3d 1517, 1524 (11th Cir. 1995). Likewise, concern over interference with an agency's decisionmaking process before it has the opportunity to finalize its policies implicates the fitness of a case for adjudication. As the Supreme Court said in Abbott Laboratories v. Gardner:

> [I]t is fair to say that [the] basic rationale [of the ripeness doctrine] is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

387 U.S. 136, 148-49, 87 S. Ct. 1507, 1515 (1967) (footnote omitted).

Consideration of both of these concerns leads us to conclude that the plaintiffs' claims against the Bar are not mature for adjudication at this time. First, although it may appear that the plaintiffs' claims involve a pure question of law (whether the Bar's advisory opinion comports with the First Amendment), an important factual issue must be resolved first – what the actual policy of the Bar is concerning the questionnaire. The informal opinion of the Bar's general counsel does not establish the Bar's policy. The general counsel can say whatever he wants, but unless the Disciplinary Commission agrees, his unofficial statements are not the official policy of the Bar. The Alabama

15

Supreme Court has vested "exclusive disciplinary jurisdiction" over members of the Bar in the "Disciplinary Commission and Disciplinary Board of the Alabama State Bar, with review by the Supreme Court of Alabama." Ala. R. Disciplinary P. 1. Only the Disciplinary Commission may initiate formal disciplinary charges, see Ala. R. Disciplinary P. 16, 17 & 19, or issue advisory opinions that are binding on and enforceable against the Bar itself. See Ala. R. Disciplinary P. 18. Therefore, despite the "legal" appearance of the questions involved in the plaintiffs' claims, the unresolved, fundamental factual issue of what the Bar's official position is in regard to the questionnaire counsels strongly against finding ripeness.

Furthermore, allowing Alabama's agency charged with overseeing lawyer discipline to formulate and crystallize its policies without undue interference from the federal courts is a good thing, and that also weighs strongly in favor of the conclusion that the plaintiffs' claims against the Bar are premature. This case is similar to Digital, in which we found, in light of the "basic rationale" for the ripeness doctrine discussed in Abbott Laboratories, that the plaintiff "did not pursue its claims with the requisite diligence to show that a mature case or controversy exists." 121 F.3d at 590. In that case, which also involved a First Amendment challenge, the plaintiff had been informed by a

16

zoning department employee that a proposed use for a building was impermissible. Instead of speaking with the employee's supervisor or attempting to get a variance, however, the plaintiff filed suit. In finding that the claim was not ripe, we stated that, "[a]t a minimum, Digital had the obligation to obtain a conclusive response from someone with the knowledge and authority to speak for the City regarding the application of the zoning scheme to Digital's proposal." Id. We explained that:

> In order for the city to have "applied" the ordinance to Digital, a city official with sufficient authority must have rendered a decision regarding Digital's proposal. . . . As the Supreme Court held in Abbott, a "basic rationale" of the ripeness doctrine is "to protect the [administrative] agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." 387 U.S. at 148-49, 87 S. Ct. at 1515. Digital's impatience precluded the formation of a concrete case or controversy. Without the presentation of a binding conclusive administrative decision, no tangible controversy exists and, thus, we have no authority to act.

Id. We explained that the plaintiff in Digital had only presented a "potential dispute," which was "founded upon its anticipated belief that [the city] would interpret [its zoning ordinances] in such a way as to violate Digital's First Amendment rights." Id. at 590-91. We concluded that "[u]nder the facts at issue, Digital, in its haste to preserve its perceived First Amendment rights, failed to present a mature claim for review." Id. at 590.

The same rationale leads us to conclude that the plaintiffs in this case jumped the gun in bringing their claims against the Bar. The Bar's Disciplinary Commission – the only body permitted to formalize official policies on behalf of the Bar – did not approve, and was not asked to review, the informal opinion issued by the Bar's Office of General Counsel. The plaintiffs do not dispute that the Bar rules provide a procedure by which any attorney, after receiving an advisory opinion from the Bar's general counsel, can obtain review from the Disciplinary Commission, a review that will establish the Bar's formal position. Nor do the plaintiffs offer any explanation for their having failed to seek that review.[7] A formal advisory opinion, or concurrence in the general counsel's opinion, by the Disciplinary Commission pursuant to the Rule 18 procedure would have constituted a definitive statement from the authoritative body concerning the Bar's enforcement policy. By foregoing that option and rushing into federal court to seek an injunction, the plaintiffs have not allowed the Bar to formulate a final policy, but instead have asked the district court and

---

[7]It is not clear from the text of Rule 18 that the Christian Coalition was itself entitled to request an advisory opinion from the Bar's Disciplinary Commission regarding the propriety of its questionnaire. However, the Bar has argued to this Court that all of the plaintiffs could and should have taken advantage of that procedure, and the Christian Coalition has not disputed the availability of the procedure. Therefore, we assume that the Christian Coalition, either in its own right or through an attorney or judicial candidate sympathetic to it, could have requested review by the Bar's Disciplinary Commission of the general counsel's advisory opinion.

18

now this Court to speculate, without any evidentiary basis, that the Bar's

Disciplinary Commission would agree with the general counsel's opinion

concerning the application of the Canons of Judicial Ethics to candidates

responding to the Christian Coalition's questionnaire.   The ripeness doctrine is

designed to prevent federal courts from engaging in such speculation and

prematurely and perhaps unnecessarily reaching constitutional issues.

Before concluding the ripeness analysis, however, we must also consider

the "hardship" to the plaintiffs from withholding adjudication at this time.[8]  We

have recognized that "[p]otential litigants suffer substantial hardship if they are

forced to choose between foregoing lawful activity and risking substantial legal

sanctions," and "a party does not have to risk probable criminal sanctions in

order to bring a justiciable pre-enforcement challenge."  Cheffer, 55 F.3d at

1524.  Therefore, if a party is to suffer an "immediate and direct impact" from a

---

[8]Under Supreme Court precedent and our case law, the relationship between the fitness and hardship prongs of the ripeness inquiry is not entirely clear.  See Erwin Chemerinsky, Federal Jurisdiction § 2.4.3 (3d ed. 1999) (noting that "[t]he interaction of these two requirements for determining ripeness is not clear," and that, while some commentators state that ripeness may be found if either fitness or hardship is shown, the Supreme Court's decisions "seem to indicate that both requirements must be met").  It is unclear, for example, whether a sliding scale approach should be applied such that some prematurity can be excused if more hardship is shown, or whether both fitness and hardship must be shown in every case before a claim will be treated as ripe.  Id.   In this case, we need not resolve this complex issue because the plaintiffs, whose claims are premature,  have failed to show that they would suffer hardship if those claims are not adjudicated.

19

challenged policy, a case is more likely to be considered ripe.  <u>Bankers Life &</u>

<u>Cas. Co. v. Callaway</u>, 530 F.2d 625, 631 (5th Cir. 1976).

In <u>Ohio Forestry</u>, the Supreme Court discussed the types of hardship that might cause a case to be considered ripe.  523 U.S. at 733-736, 118 S. Ct. at 1670-71.  First, the Court noted that hardship might be present where a policy results in "adverse effects of a strictly legal kind."  <u>Id.</u> at 733, 118 S. Ct. at 1670.  The Court explained that such effects are not present if the challenged policies "do not command anyone to do anything or to refrain from doing anything; they do not grant, withhold, or modify any formal legal license, power, or authority; they do not subject anyone to any civil or criminal liability; they create no legal rights or obligations."  <u>Id.</u>  Second, the Court stated that an "important consideration" in modern ripeness cases is whether the challenged policy "inflicts significant practical harm upon the interests that the [plaintiff] advances."  <u>Id.</u> at 733-34, 118 S. Ct. at 1670.  Such "practical harm" is not likely to be present where a plaintiff "will have ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain."  <u>Id.</u> at 734, 118 S. Ct. at 1670.  Finally, the Supreme Court said that a court should consider whether the plaintiff "pointed to any other way in which the [policy]

20

could now force it to modify its behavior in order to avoid future adverse consequences. . . ." Id. at 734, 118 S. Ct. at 1671.

The plaintiffs in this case have failed to show that they would suffer the types of hardship discussed in Ohio Forestry if adjudication is withheld until a more mature case can be presented. Given the non-binding, informal nature of the general counsel's advisory opinion, it is clear that the plaintiffs have not suffered any "adverse effects of the strictly legal kind." The plaintiffs are in exactly the same position after the advisory opinion was issued, legally speaking, as they were beforehand. In both cases, their conduct was constrained by the Canons of Judicial Ethics (and the Bar Rule of Professional Conduct which incorporates those canons and applies them to attorneys who are judicial candidates), whatever they mean, and not by any informal advisory opinions of the Bar's general counsel.

Whether the plaintiffs have shown hardship in the "practical" sense or hardship resulting from being forced to modify behavior presents a closer question. The plaintiffs argue that practical harm occurred because their speech was chilled as a result of the general counsel's advisory opinion, but under the unique circumstances of this case, we conclude the plaintiffs have not shown sufficient hardship to warrant our exercise of jurisdiction over their otherwise

21

premature claims.[9] By focusing on "practical harm," the Supreme Court showed us that the hardship prong is inherently fact-sensitive, and we should look for actual prejudice to the plaintiffs from withholding adjudication. The plaintiffs in this case can show no actual prejudice from our withholding adjudication of their claims against the Bar, because the JIC's advisory opinion cautioning judicial candidates not to respond to the Christian Coalition's questionnaire was issued before the Bar's Office of General Counsel issued its advisory opinion. The JIC's opinion was a formal advisory opinion issued by the body authorized to initiate formal charges against Alabama's judges. In light of that opinion, and without regard to the general counsel's informal advisory opinion, any judicial candidate intent on avoiding disciplinary action relating to the Alabama Canons of Judicial Ethics would have avoided answering the questionnaire as a result of the JIC opinion. There is no reason to assume that any candidate would ignore the more formal JIC opinion, but suddenly alter his or her behavior in response to an informal, non-binding

---

[9]We note that the plaintiffs have not argued to this Court that the shortness of time between the issuance of the Bar's advisory opinion and the general election caused any hardship that should excuse the immaturity of their claims. In particular, they have not argued that they would have been unable to receive from the Bar's Disciplinary Commission an opinion, or review of the general counsel's opinion, in time for the voter guide to be published before the election. Therefore, we need not decide whether the plaintiffs' claims would have been considered ripe if such a showing had been made.

opinion issued by the Bar's Office of General Counsel.[10]  Therefore, the general counsel's informal advisory opinion, standing alone, caused no practical harm to the plaintiffs.

Our conclusion that the plaintiffs in this case suffered no hardship as a result of the general counsel's informal advisory opinion is necessarily a narrow one, limited to the facts of this case.  We need not and do not decide whether the plaintiffs would have presented a ripe claim against the Bar if the  JIC had not previously issued its opinion or if other facts were different.   Because we conclude that the plaintiffs' claims were significantly "unfit" in light of the fact that the Bar's Disciplinary Commission had not been given the opportunity to consider, establish, and announce the Bar's actual enforcement policy, and bearing in mind the ripeness doctrine's "basic rationale" of allowing agencies to formulate final policies without judicial interference, we conclude that the plaintiffs' claims should be dismissed as unripe. We will remand for that purpose.[11]

---

[10]Both sides agree that the JIC would have jurisdiction to bring an action based upon violations that were committed by an attorney during a successful campaign for the judgeship. See, e.g., Ala. Canons Jud. Ethics 7(B)(1). As a result,  the only candidates for judicial office who might have been more concerned with the Bar's position on the canons than with the JIC's are those who were convinced they were not going to be elected. None of these plaintiffs admits to being in that category.

[11]We note that as a practical matter, our decision that the claims against the Bar should be dismissed might be of little consequence to the plaintiffs.  As we explain below, the district court

23

## 2. Standing

With the Bar out of the case, we turn now to the JIC's contention that the plaintiffs lack standing to pursue their claims against it. We review de novo whether a plaintiff has standing to bring suit in federal court. See Wilson v. State Bar of Ga., 132 F.3d 1422, 1427 (11th Cir. 1998).

This Court has held that three requirements must be satisfied for standing:

> [A] plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

White's Place, Inc. v. Glover, 222 F.3d 1327, 1329 (11th Cir. 2000) (quotation omitted). The Supreme Court has described these three requirements as the "irreducible minimum" of the constitutional standing requirements. Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 472, 102 S. Ct. 752, 758 (1982). "The burden is on the

---

should certify unsettled questions of state law – including the meaning of the Canons of Judicial Ethics addressed in both the JIC and Bar advisory opinions – to the Alabama Supreme Court on remand. If the Supreme Court decides to respond to the certified questions and explains the meaning of the canons and their applicability to the plaintiffs' conduct that is the subject of this case, those answers will bind both the JIC and the Bar, and the Bar would not have the authority to adopt an enforcement policy contrary to the Alabama Supreme Court's interpretation of the canons. Nonetheless, the Bar has insisted on its ripeness defense and we have ruled on it.

party seeking to exercise jurisdiction to allege and then to prove facts sufficient to support jurisdiction." White's Place, 22 F.3d at 1329.

### a. *Injury In Fact*

We have recognized that "[t]he injury requirement is most loosely applied – particularly in terms of how directly the injury must result from the challenged governmental action – where First Amendment rights are involved, because of the fear that free speech will be chilled even before the law, regulation, or policy is enforced." Hallandale, 922 F.2d at 760 (capitalization altered). Moreover, "[w]e will not force a plaintiff to choose between intentionally violating a law to gain access to judicial review and foregoing what he or she believes to be constitutionally protected activity in order to avoid criminal prosecution." White's Place, 222 F.3d at 1329. "But even in a First Amendment context the injury to the plaintiff requirement cannot be ignored." Hallandale, 922 F.2d at 760 (capitalization altered).

The plaintiffs argue that they suffered an injury in fact because the JIC advisory opinion had a chilling effect on their exercise of their First Amendment rights. In the case of the plaintiffs who were candidates, this alleged injury resulted in self-censorship. The Christian Coalition's alleged

injury was its inability to receive speech from a willing speaker.[12]  We have

recognized on several occasions that the chilling effect on speech and resulting

self-censorship are types of injuries which may suffice for standing purposes.

In another case involving a challenge to bar association rules, we explained

that:

> In the First-Amendment realm, plaintiffs do not have to expose
> themselves to enforcement in order to challenge a law.  Rather, an
> actual injury can exist when the plaintiff is chilled from exercising
> her right to free expression or forgoes expression in order to avoid
> enforcement consequences.  In such an instance, which is what is
> alleged here, the injury is self-censorship.

Wilson, 132 F.3d at 1428 (citations and quotations omitted).

In order to have standing in this context, however, the plaintiff must

show that he or she had "an intention to engage in a course of conduct arguably

affected with a constitutional interest, but proscribed by a statute, and there

exists a credible threat of prosecution."  Id. (emphasis added).  See also ACLU

---

[12]The Supreme Court has recognized that the First Amendment offers protection to both speakers and those wishing to receive speech.  In Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., the Court stated: "Freedom of speech presupposes a willing speaker.  But where a speaker exists, as is the case here, the protection afforded is to the communication, to its source and to its recipients both."  425 U.S. 748, 756, 96 S. Ct. 1817, 1823 (1976).  Therefore, an injury in fact to the Christian Coalition's right to receive speech from a willing speaker suffices to confer standing.  See, e.g., Davis v. East Baton Rouge Parish School Bd., 78 F.3d 920, 926-27 (5th Cir. 1996) (holding that news agency had standing to pursue claim that it was entitled to receive speech); Dow Jones & Co., Inc. v. Simon, 842 F.2d 603, 608 (2d Cir. 1988) ("It is that right to receive speech that affords standing to the press to maintain this action.").

26

v. Florida Bar, 999 F.2d 1486, 1492 (11th Cir. 1993) (noting that courts "have asked whether the plaintiff is seriously interested in disobeying, and the defendant seriously intent on enforcing the challenged measure"). This Court has stated that "a plaintiff has standing if he demonstrate[s] a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." Jacobs v. Florida Bar, 50 F.3d 901, 904 (11th Cir. 1995) (finding standing to challenge bar rules restricting advertisements) (quotation omitted). In ACLU, we held that in order for a plaintiff alleging that his speech was chilled to have standing, he or she must show "that either (1) he was threatened with prosecution; (2) prosecution is likely; or (3) there is a credible threat of prosecution." 999 F.2d at 1492 (noting also that likelihood of disciplinary action was an "important factor" in determining whether plaintiff's speech objectively was chilled).

This requirement comes from the Supreme Court's recognition that "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." Laird v. Tatum, 408 U.S. 1, 13-14, 92 S. Ct. 2318, 2325-26 (1972). Therefore, "if no credible threat of prosecution looms, the chill is insufficient to sustain the burden that Article III imposes. A party's subjective fear that she may be

27

prosecuted for engaging in expressive activity will not be held to constitute an injury for standing purposes unless that fear is objectively reasonable." Wilson, 132 F.3d at 1428.

We conclude that the plaintiffs have made a sufficient showing that their First Amendment rights were chilled as a result of the JIC's advisory opinion. The chill was evidenced by the unwillingness of the judicial candidates to respond to the Christian Coalition questionnaire, or their withdrawal of previous responses, following the issuance of the JIC's advisory opinion, and the Christian Coalition's concomitant inability to receive responses from otherwise willing speakers. The fact that speech was chilled is undisputed by the JIC, although it does dispute the cause of the chill – arguing that the Canons of Judicial Ethics rather than its advisory opinion caused any chill.

We conclude that the chill resulting from the JIC's advisory opinion satisfied the injury in fact requirement and was objectively reasonable  because the advisory opinion created a sufficiently credible threat of prosecution.  As the Alabama Supreme Court recently noted, "[t]he Alabama Constitution vests enforcement of the Alabama Canons of Judicial Ethics in the JIC." Butler v. Ala. Judicial Inquiry Comm'n, ___ So.2d ___, No. 1001119 (Ala. May 15, 2001).  "If the JIC determines that a reasonable basis exists for a finding of an

28

ethics violation, the JIC may file a complaint with the Court of the Judiciary."

Id. After the JIC files charges with the Court of the Judiciary, the charged judge is suspended from serving as a judge until a final resolution is reached. Id. Therefore, under Alabama law, the JIC is "an investigatory body analogous to a grand jury," and its charging decisions have substantial and immediate impact on Alabama judges. Matter of Samford, 352 So.2d 1126, 1129 (Ala. 1977). Under these circumstances, the formal advisory opinion of the enforcement body with authority to bring charges against judges created an objectively reasonable chill on the First Amendment rights of the Alabama judicial candidates who are the plaintiffs in this case. Therefore, those individual plaintiffs suffered an injury in fact, which in turn caused an injury in fact to the Christian Coalition plaintiff.

b. *Traceability and Redressability*

The next two steps in the standing analysis ask whether the injury in fact is "fairly traceable to the challenged action of the defendant," and whether "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." White's Place, 222 F.3d at 1329. For the same reasons that led us to conclude that the chilling effect on the plaintiffs' speech was objectively reasonable, we also conclude that the injury suffered by the

29

plaintiffs is both traceable to the JIC's advisory opinion and redressable by the relief sought by the plaintiffs. Regardless of the (still uncertain) meaning of the underlying canons, it was the declaration of the JIC – the body authorized to enforce the canons and initiate disciplinary charges against judges – through its formal advisory opinion that caused the threat of prosecution to become credible and made the chill on speech objectively reasonable. Therefore, the plaintiffs' injury was traceable to the JIC's advisory opinion.

A properly crafted declaratory judgment and injunction ensuring that the enforcement authority would not enforce the canons in a manner inconsistent with the First Amendment would redress the plaintiffs' injury and eliminate any unjustified chill. Therefore, we conclude that the plaintiffs had standing to bring their claims against the JIC.

## B. ABSTENTION AND CERTIFICATION

Next we turn to the district court's decision to abstain from reaching the merits of the plaintiffs' claims so that the Alabama state courts could resolve unsettled issues of law, potentially obviating the need for the federal courts to consider the plaintiffs' federal constitutional claims. See Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 61 S. Ct. 643 (1941). "It is axiomatic that the federal courts should, where possible, avoid reaching constitutional

questions." Allstate Ins. Co. v. Serio, ___ F.3d ___, Nos. 00-7769(L)-7780(CON) (2d Cir. July 23, 2001).  To achieve that, "where possible, courts will render decisions on federal constitutional questions unnecessary by resolving cases on the basis of state law (whether statutory or constitutional)." Id.  If the germane state law questions are novel or unsettled, however, principles of federalism counsel in favor of allowing state courts, instead of federal courts, to interpret and define state law before the federal courts subject the state law to federal constitutional scrutiny.  Id.  That goal may be accomplished through either Pullman abstention or certification procedures.  Id.

In this case, the district court opted to abstain from reaching the merits of the plaintiffs' claims in the hope that Alabama courts would resolve unsettled issues of law.  Although it is the plaintiffs who appeal this aspect of the district court's decision, none of the parties is happy with the approach chosen by the court.  The plaintiffs argue that there was no "unclear question of state law" justifying  abstention, and that, in light of the important First Amendment issues at stake and the lack of any "unique circumstances," it was inappropriate to abstain.  The plaintiffs also maintain that they should be permitted to vindicate their federal constitutional rights in a federal forum.  The defendants respond that a Pullman abstention would have been appropriate in this case, but argue

31

that the district court did not really abstain given the scope and potential duration of the preliminary injunction.

We agree that the district court should not have abstained in the manner and for the reasons that it did. However, the district court was correct in recognizing that unsettled issues of state law could well shape if not moot the plaintiffs' federal constitutional claims. But, as we explain below, we think that the more appropriate procedure for resolution of the state law issues is certification of those issues to the Alabama Supreme Court, and we will remand so the district court may do that.

## 1. Pullman Abstention

We first address the Pullman abstention doctrine and the problems with the abstention order entered in this case. We review a district court's decision to abstain on Pullman grounds for an abuse of discretion. Boyes v. Shell Oil Prods. Co., 199 F.3d 1260, 1265 (11th Cir. 2000). In Siegel v. LePore, the en banc Court described the Pullman abstention doctrine as follows:

> Under the Pullman abstention doctrine, a federal court will defer to state court resolution of underlying issues of state law. Two elements must be met for Pullman abstention to apply: (1) the case must present an unsettled question of state law, and (2) the question of state law must be dispositive of the case or would materially alter the constitutional question presented. The purpose of Pullman abstention is to avoid unnecessary friction in federal-state functions, interference with important state functions,

32

tentative decisions on questions of state law, and premature constitutional adjudication. Because abstention is discretionary, it is only appropriate when the question of state law can be fairly interpreted to avoid adjudication of the constitutional question.

234 F.3d 1163, 1174 (11th Cir. 2000) (citations and quotations omitted).

Whether state law is susceptible to a construction that will avoid the federal constitutional issues has been described by the Supreme Court as the "pivotal question" in determining whether abstention is appropriate. City of Houston v. Hill, 482 U.S. 451, 468, 107 S. Ct. 2502, 2513 (1987).

In Duke v. James, 713 F.2d 1506, 1510 (11th Cir. 1983), we discussed the circumstances under which abstention is appropriate, explaining:

It is improper . . . to view abstention as a tool merely to extract from the state courts an alternative state law ground for the judgment. Abstention is not intended to serve in this manner when state law is clear. Similarly, if the state court will merely apply federal constitutional law, then the state construction will not moot or modify the constitutional question. Abstention should not be used as a lever to force the state courts to do the federal courts' work. Such would thwart [the plaintiff's] choice of the alternative federal forum, specifically provided by Congress.

Congress has deliberately afforded the section 1983 plaintiff an alternative federal forum. It is not for the courts to withdraw that jurisdiction which Congress has expressly granted under section 1983 where such a withdrawal is contrary to the purpose of Congress in extending that alternative forum. In this regard, the Pullman doctrine is narrow and is tightly circumscribed. A federal court must grapple with difficult constitutional questions that confront it squarely. The abstention doctrine is an exception to this

33

rule, to be exercised only in special or "exceptional" circumstances.

Id. (emphasis in original) (footnotes omitted). The Duke Court also noted that in addition to the two requirements that must be met in order to for a Pullman abstention to be appropriate, courts should consider the following factors:

Factors arguing against abstention include delay, cost, doubt as to the adequacy of state procedures for having the state law question resolved, the existence of factual disputes, and the fact that the case has already been in litigation for a long time. Factors which might favor abstention include the availability of "easy and ample means" for determining the state law question, the existence of a pending state court action that may resolve the issue, or the availability of a certification procedure, whereby the federal court can secure an expeditious answer.

Id. (footnotes omitted).

In addition to those factors, we have noted that, "[i]n considering abstention, we must take into account the nature of the controversy and the importance of the right allegedly impaired." Siegel, 234 F.3d at 1174 (finding that abstention was less appropriate in context of voting rights). For example, we have said that "[a]bstention is to be invoked particularly sparingly in actions involving alleged deprivations of First Amendment rights." Cate, 707 F.2d at 1184.

For several reasons, we conclude that the district court abused its discretion by abstaining in the way that it did in this case. In its order, the

34

district court abstained from reaching the merits, or even the likelihood of success on the merits, of the plaintiffs' claims, so that the Alabama state courts could consider unsettled issues of law. To support this holding, the court noted that "the facts pose an important constitutional issue regarding the scope of the FIRST AMENDMENT right to free speech among judicial candidates and the [Christian Coalition] in the State of Alabama." Pittman, 117 F. Supp.2d at 1313 (capitals in original). The court found that Alabama law was unsettled in the following respects:

> Notably, the Supreme Court of Alabama has never interpreted the FIRST AMENDMENT in light of the type of facts with which this Court is now confronted. It is unsettled, as a matter of state law, whether state officials who have been sued in their individual and official capacities for establishing alleged unconstitutional enforcement policies, may be acting in violation of the FIRST AMENDMENT when they interpret the Canons "as-applied" to specific facts. Moreover, due to the material change in the type and number of questions in the [Christian Coalition] survey (from 30 to 15), the JIC and [the Bar] state entities overseeing the conduct of the judiciary, have not yet had the opportunity to provide a determination as to the remaining questions at the state level.

Id. at 1313 n.58 (capitals in original). The court further noted that "it is by no means clear that the JIC and [Bar general counsel] challenged Opinions and 'enforcement policies' comport with the ALABAMA CANONS and/or the U.S. CONSTITUTION, which reveals an unsettled question of state constitutional

law which may moot Plaintiffs' federal constitutional claims and presents a classic case for abstention." Id. at 1313 (capitals in original).

Those excerpts from the district court's opinion show that the court opted for abstention not simply so that the state courts could address unsettled issues of state law, but also so that they could take the first crack at the federal constitutional issues. See also Id. at 1317 ("[T]his Court RETAINS jurisdiction, not for the purposes of providing for a hearing on the merits, because granting this preliminary injunction, if there is compliance, should obviate the need for future proceedings . . . .") (capitals in original). As our opinion in Duke indicated, such an approach is an improper use of the abstention procedure. See Duke, 713 F.2d at 1510 ("Abstention should not be used as a lever to force the state courts to do the federal courts' work."). Federal courts may abstain in order to permit state courts to decide unsettled questions of state law, and resolution of the state law issues may moot the federal constitutional issues. But federal courts should not abstain in order to avoid the task of deciding the federal constitutional issues in a case. Id.

Another problem with the district court's approach to abstention in this case is that it did not ensure the state law issues would actually be decided by the Alabama courts. We have recognized that the existence of a pending state

36

court proceeding concerning the unsettled state law issues may support a federal court's decision to stay its hand, but here there was none. A second approach that has been employed by federal courts is to require the parties to institute appropriate state court proceedings.[13] In fact, we have noted that "[t]he classic Pullman-type abstention order requires the parties to commence an action in state court for a declaratory judgment on the state law issues." Ziegler v. Ziegler, 632 F.2d 535, 539 (5th Cir. 1980). The district court in this case declined to do so.

In light of the approach taken by the district court, the JIC complains for good reason that the abstention order inappropriately gave the plaintiffs all of the relief which they requested without ensuring that any court would ever consider the merits of their claims. The court's order left the plaintiffs with no incentive or requirement to actually resort to the Alabama state courts, and they have not done so. In response to the defendants' motions for rehearing or

---

[13]On occasion we have also discussed available certification procedures as a method for obtaining state court pronouncements on unclear issues of state law pursuant to a Pullman abstention. See Duke, 713 F.2d at 1510. More recently, however, the Supreme Court has viewed certification as a method separate and apart from abstention and one to which different standards apply, instead of being a procedure that can be employed to effectuate state court decision of state law issues during a Pullman abstention. See Arizonans for Official English v. Arizona, 520 U.S. 43, 75-80, 117 S. Ct. 1055, 1073-75 (1997). In keeping with this distinction, we will discuss the propriety of certification separately later in this opinion, instead of considering it under the abstention framework.

clarification, the district court reiterated that "the preliminary injunction remains if no subsequent action is pursued at the state level to obtain a determination on the merits of this case." Under the district court's order, the only way that the Alabama state courts will ever consider the unsettled state law issues is if the JIC brings a state court action seeking a declaration of the validity of its own advisory opinion. Requiring the JIC to do that is inappropriate because the plaintiffs bear the burden of showing their entitlement to relief.

Therefore, we conclude that the district court's abstention order is defective both because it granted the plaintiffs relief of potentially indefinite duration without ensuring that the state law issues would ever be presented to the state courts, and because the decision to abstain was designed to have the state courts decide the federal constitutional issues that the plaintiffs had first presented to the federal courts.

## 2. Certification

Although we conclude that the district court erred by abstaining in the manner that it did in this case, we agree with it that there exist important, unsettled issues of state law which are likely to shape, alter, or moot the federal constitutional issues raised by the plaintiffs' claims. Instead of a Pullman

38

abstention, however, the preferable way to obtain state court resolution of those state law issues is through the certification process established by the Alabama Supreme Court, which we have received the benefit of so many times before. See Ala. R. App. P. 18.[14]

The United States Supreme Court repeatedly has recognized that federal courts have discretion to certify "[n]ovel, unsettled questions of state law" to a state's highest court for resolution. Arizonans for Official English v. Arizona, 520 U.S. 43, 79, 117 S. Ct. 1055, 1074 (1997). Certification of questions to a state's highest court, where the procedure is available, offers substantial benefits over the traditional Pullman abstention method. While both certification and Pullman abstention allow state courts the opportunity to resolve state law issues, certification "in the long run save[s] time, energy, and resources and helps build a cooperative judicial federalism." Lehman Bros. v. Schein, 416 U.S. 386, 391, 94 S. Ct. 1741, 1744 (1974). See also Arizonans for Official English, 520 U.S. at 79, 117 S. Ct. at 1075 ("[Certification] procedures

---

[14]Rule 18 of the Alabama Rules of Appellate Procedure, in part, states: "When it shall appear to a court of the United States that there are involved in any proceeding before it questions or propositions of law of this State which are determinative of said cause and that there are no clear controlling precedents in the decisions of the Supreme Court of this State, such federal court may certify such questions or propositions of law of this State to the Supreme Court of Alabama for instructions concerning such questions or propositions of state law, which certified question the Supreme Court of this State, by written opinion, may answer."

39

do not entail the delays, expense, and procedural complexity that generally attend abstention decisions."). Most recently in <u>Arizonans for Official English</u>, a unanimous Supreme Court extolled the virtues of the certification procedure and its benefits over more traditional abstention, stating:

> Certification today covers territory once dominated by a deferral device called "<u>Pullman</u> abstention," . . . . Designed to avoid federal-court error in deciding state-law questions antecedent to federal constitutional issues, the <u>Pullman</u> mechanism remitted parties to the state courts for adjudication of the unsettled state-law issues. If settlement of the state-law question did not prove dispositive of the case, the parties could return to the federal court for decision of the federal issues. Attractive in theory because it placed state-law questions in courts equipped to rule authoritatively on them, <u>Pullman</u> abstention proved protracted and expensive in practice, for it entailed a full round of litigation in the state court system before any resumption of proceedings in federal court. Certification procedure, in contrast, allows a federal court faced with a novel state-law question to put the question directly to the State's highest court, reducing the delay, cutting the cost, and increasing the assurance of gaining an authoritative response.

<u>Id.</u> at 75-76, 117 S. Ct. at 1073 (citations omitted). The Supreme Court noted that the certification procedure is useful in avoiding "premature adjudication of constitutional questions," and that its use allows a federal court to avoid "risk[ing] friction-generating error when it endeavors to construe a novel state [law] not yet reviewed by the State's highest court." <u>Id.</u> at 79, 117 S. Ct. at 1074.

40

In addition to the efficiency benefits of the certification procedure, the Second Circuit recently recognized additional reasons why a federal court might decide that certification of a state law question is preferable and preferable to more traditional abstention.  See Serio, ___ F.3d at ___.  The Court noted that "[c]ertification  means that, if the state court's decision as to state law does not render a federal constitutional judgment unnecessary, the federal issue will be resolved by a federal court," rather than "ceding that responsibility, as an initial (and usually conclusive) matter, to the state courts."  Id. (emphasis in original). With certification, the federal courts retain jurisdiction and ultimately will decide federal constitutional questions, if necessary.

Additionally, "certification does no more than give the highest court of a state an opportunity to do with a state law what we [federal courts] would do, as a matter of course, were we dealing with a federal statute," namely attempt to interpret it in such a way as to make it constitutional.  Id.  (emphasis in original). Providing a state court with that opportunity is especially important, because  "[i]t may well be that the courts of the relevant state are less constrained than is the federal judiciary with respect to statutory interpretation." Id.  Under such circumstances, it would "infringe on the sovereign immunity of the states" if federal courts were to "deprive the state courts of the opportunity

41

to construe their own statutes, using the interpretative tools, presumptions, and standards they deem proper." Id. This concern takes on added significance where, as here, we are faced not with a state statute, but instead with rules, such as the Canons of Judicial Ethics, that the state supreme court is not only charged with defining and applying, but that it can also repeal or rewrite as it deems necessary. See, e.g., Butler, ___ So.2d ___. And these are not just any rules, but ethical canons that govern all Alabama judges and judicial candidates, and are therefore a matter of considerable sensitivity. See generally Blue Cross and Blue Shield of Ala. v. Nielsen, 116 F.3d 1406, 1413 (11th Cir. 1997) (noting desirability of employing certification in context of sensitive state law issues).

Moreover, in cases such as this one where abstention may be problematic because important constitutional rights are involved and delay should be avoided, "the availability of certification greatly simplifies the analysis" as to whether and how a federal court should seek guidance from state courts on state law issues. Bellotti v. Baird, 428 U.S. 132, 151, 96 S. Ct. 2857, 2868 (1976). In the context of a First Amendment challenge to a state statute, the Supreme Court in Virginia v. American Booksellers Assoc., Inc., concluded that certification was preferable to abstention because "[c]ertification, in contrast to the more cumbersome and (in this context) problematic abstention doctrine, is a

42

method by which we may expeditiously obtain that [authoritative] construction" of state law by a state supreme court. 484 U.S. 383, 396, 108 S. Ct. 636, 644 (1988). Likewise, in Cate v. Oldham, we found that abstention was inappropriate in light of the high stakes involved in a First Amendment case, but concluded that:

> Nevertheless we do not ignore the related values of avoiding unnecessary decision of federal constitutional questions and guaranteeing that state law is interpreted correctly. . . . The State of Florida, by providing a procedure for certification of state law issues to the Florida Supreme Court, Fla. Stat. Ann. § 25.031, has afforded a mechanism whereby these values can be given due protection while avoiding the substantial costs of abstention.

707 F.2d 1176, 1185 (11th Cir. 1983) (citation omitted).

In light of the numerous benefits offered by the certification procedures, we have treated certification as a "valuable tool for promoting the interests of cooperative federalism," and we have not hesitated to pull it out of our toolbox. Nielsen, 116 F.3d at 1413. In fact, we have employed the certification procedure more than any other circuit, see id., and we make no apologies for having done so.

We think that certification will do the job in this case. As the district court correctly noted, there are important, unsettled questions of state law that may alter or obviate the federal constitutional questions that the federal courts

43

are to decide in this case.[15]  Although we have often exercised our discretion to certify questions to state supreme courts directly from our Court, we need not do so in this case because the Alabama certification rule permits federal district courts to utilize the certification procedure. See Ala. R. App. P. 18.  Given the nature of the issues appealed to us, the status of the case, and other circumstances, we think it is preferable to have the district court certify the relevant state law questions to the Alabama Supreme Court so it can receive and react to the answers in the first instance.

On remand, the district court should certify to the Alabama Supreme Court the question of whether the Alabama Canons of Judicial Ethics prohibit a judicial candidate from answering some or all of the questions contained in the Christian Coalition questionnaire, and, if so, which questions are barred by which canons.  The district court may also certify to the Alabama Supreme Court any other unsettled state law questions that it decides could be "determinative" of any of the plaintiffs' claims. See Ala. R. App. P. 18. It should allow the parties to have input into the formulation of the questions

---

[15]The plaintiffs argue that abstention was inappropriate because there were no "unique circumstances" in this case supporting such an approach.  In light of our holding, we need not determine whether the district court was faced with "unique circumstances," because the Supreme Court has held that to support certification, "[n]ovel, unsettled questions of state law . . . not 'unique circumstances' are necessary." Arizonans for Official English, 520 U.S. at 79, 117 S. Ct. at 1074-75.  This lesser standard is certainly satisfied under the circumstances of this case.

44

certified, but of course the final responsibility for formulating them rests with the district court.[16]

When the district court formulates its questions to certify to the Alabama Supreme Court, it should not ask that Court to apply the First Amendment, or any other federal law, to its interpretation of state law, nor should the district court seek guidance from the Alabama Supreme Court on any issues of federal law. We have recognized that "[w]hile state and federal courts have concurrent jurisdiction to decide federal law issues . . ., federal courts have the responsibility for deciding those issues when they arise in federal court." Spain v. Brown & Williamson Tobacco Corp., 230 F.3d 1300, 1312 n.16 (11th Cir. 2000). Therefore, as is true with the Pullman abstention procedure, "a federal court may not certify federal law issues to a state supreme court." Id. Instead the district court should undertake that analysis itself after the Alabama Supreme Court answers the certified question(s), assuming that Court decides to respond to the certified questions, a matter always within its unbridled authority and discretion. Of course, we do not mean to imply that the Alabama Supreme

---

[16]This Court has a practice of always including within any certification of state law issues an explicit statement that the state supreme court is free to restate or reformulate the state law questions as it deems proper. See, e.g., Butler v. Ala. Judicial Inquiry Comm'n, 245 F.3d 1257, 1266 (11th Cir. 2001); Spain v. Brown & Williamson Tobacco Corp., 230 F.3d 1300, 1312 (11th Cir. 2000). We commend that practice to the district court.

45

Court is not free to take its view of the federal constitutional issues into account in interpreting its Canons of Judicial Ethics. <u>See</u>, <u>e.g.</u>, <u>Butler</u>, __ So.2d ___. But any federal constitutional issues that remain after the Alabama Supreme Court has authoritatively resolved the state law issues are to be decided by the federal courts, the courts in which the litigation first was filed.

## C.  PRELIMINARY INJUNCTION

Finally, we turn to the district court's order granting a temporary injunction protecting the plaintiffs (and all other Alabama judicial candidates) from disciplinary prosecution by the defendants, but expressly declining to address the plaintiffs' likelihood of success on the merits.  The district court decided that because it was abstaining in order to allow the Alabama courts to consider various issues  – some of which we have found should not have been punted to the state courts – it should avoid influencing the state courts' consideration by expressing its views on the plaintiffs' likelihood of success on the merits.  <u>See</u> <u>Pittman</u>, 117 F. Supp.2d at 1314-15.  In the context of preliminary injunctive relief pending abstention, the court stated that it need only find that the plaintiffs had "raised substantial questions presenting fair grounds for litigation" and that the "balance of harms" was tilted in the plaintiffs' favor.  <u>Id.</u> at 1315.

46

We note that the district court's approach does not have a basis in this Circuit's case law, and that our cases have uniformly required a finding of substantial likelihood of success on the merits before injunctive relief may be provided.  See, e.g., Siegel, 234 F.3d at 1176.  Furthermore, we have held on occasion that when a plaintiff fails to establish a substantial likelihood of success on the merits, a court does not need to even consider the remaining three prerequisites of a preliminary injunction.  See Church v. City of Huntsville, 30 F.3d 1332, 1342-47 (11th Cir. 1994); Cuban Am. Bar Ass'n, Inc. v. Christopher, 43 F.3d 1412, 1424 (11th Cir. 1995).  Specifically in the context of a First Amendment claim where this Court determined that state law issues should be certified to a state supreme court, we applied the usual four-prong test in determining that preliminary injunctive relief was appropriate in order to protect the plaintiffs while awaiting a response to the certified questions.  Cate, 707 F.2d at 1185-90 (reversing district court's finding that the plaintiff had failed to show substantial likelihood of success on the merits or irreparable injury).

That being said, for two reasons we need not decide in this case whether any lesser showing could ever be sufficient to entitle a plaintiff to preliminary injunctive relief pending abstention or certification.  First, the district court's

decision to enter a preliminary injunction was done in aid of its decision to abstain. Because we have held that the court's abstention was inappropriate in this case, the district court's preliminary injunction also must fail. Second, in light of representations the defendants (including the Bar, which is to be dismissed on remand) have made to this Court, we need not decide in this case whether injunctive relief is necessary. The defendants have represented to this Court that during the pendency of this lawsuit they will not prosecute any judicial candidate on the theory that the candidate violated the Canons of Judicial Ethics by answering the Christian Coalition questionnaire. The plaintiffs' counsel accepted these representations at oral argument and agreed that they obviated the need for a preliminary injunction. Therefore, the required showing for injunctive relief pending abstention or certification is an issue that will not recur on remand in this case, and we leave for another day whether any lesser showing could ever suffice.

### III. CONCLUSION

We VACATE the district court's order and preliminary injunction in this case, and REMAND with instructions for the district court to DISMISS the claims against the Bar's General Counsel, Defendant J. Anthony McLain. We also instruct the district court on remand to CERTIFY any unsettled questions

48

of state law that could be determinative of the plaintiffs' claims to the Alabama

Supreme Court as provided in Ala. R. App. P. 18.