[PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 23-11683

_____

OKEELANTA CORPORATION,
UNITED STATES SUGAR CORPORATION,
SUGAR CANE GROWERS COOPERATIVE OF FLORIDA,

Plaintiffs-Appellants,

*versus*

UNITED STATES ARMY CORPS OF ENGINEERS,
SECRETARY OF THE ARMY,
ASSISTANT SECRETARY OF THE ARMY (CIVIL WORKS),
LIEUTENANT GENERAL SCOTT A. SPELLMON,
in his official capacity as Commanding General and
Chief of Engineers for the United States
Army Corps of Engineers,
COLONEL ANDREW D. KELLY,

2                    Opinion of the Court                    23-11683

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:21-cv-81505-DMM

_____

Before JILL PRYOR, NEWSOM, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

United States Sugar Corporation, Okeelanta Corporation, and Sugar Cane Growers Cooperative of Florida ("Plaintiffs") brought this action under the Administrative Procedure Act against the Army Corps of Engineers ("Corps") challenging the Corps' approval and authorization of the Everglades Agricultural Area Project ("EAA Project"). The Plaintiffs appeal the district court's grant of the Corps' motion for summary judgment.

## I. BACKGROUND

The EAA Project challenged by the Plaintiffs is part of the Comprehensive Everglades Restoration Plan ("the Plan").[1] The Plan was developed by the Corps at the direction of Congress in the 1990s, and was incorporated into, and made part of federal law,

_____

[1] The district court and the parties refer to this Plan as CERP. In this opinion, we refer to it as the Plan.

by the Water Resources Development Act of 2000 ("WRDA 2000"), which statute contains the Savings Clause (described below) which forms the basis of Plaintiffs' primary challenge to the Corps' action.

The Plan is itself part of the Central and Southern Florida Project for Flood Control and Other Purposes ("C&SF Project"), which Congress granted the Corps authority to operate in 1948. The district court concisely set out the history leading up to the development of the Plan, and its incorporation into the law in WRDA 2000.

> Prior to any human intervention, Lake Okeechobee had no defined southern border. Alanna L. Lecher, Ph.D., *A Brief History of Lake Okeechobee: A Narrative of Conflict*, J. FLA. STUD., 2021, at 1, 3. During the wet seasons, Lake Okeechobee would spill over its southern edge and flow into the Everglades. *Id.* at 4.
>
> In 1850, Congress passed the "Swamp and Overflowed Lands Act of 1850, which conveyed the Everglades and surrounding overflowed areas to the State of Florida for development." *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 537 (11th Cir. 2013) (citing 9 Stat. 519, 520). Soon after, businessmen and then the State of Florida began to dredge canals to re-route the Lake's seasonal flooding into the Gulf of Mexico and the Atlantic Ocean. Lecher, *supra*, at 7–9. By the 1920's, real estate investors trusted the effectiveness of the canals enough to develop housing alongside Lake Okeechobee.

Lecher, *supra*, at 9. The canals turned out not to be enough. In 1924, following a series of floods, the State of Florida constructed a dike (5–9 ft) made of muck and rocks along the southern portion of the Lake. *Id.*

Congress, in the form of the Rivers and Harbors Act of 1930, stepped in following a pair of hurricanes in 1926 and 1928 that caused massive flooding of Lake Okeechobee, killing approximately 3,000 people. *Mildenberger v. United States*, 91 Fed. Cl. 217, 226 n.3 (Fed. Cl. 2010). The small dike of muck and rocks was swept away along with various communities. Lecher, *supra*, at 10. In the 1930 Act, Congress directed the Secretary of War (now the Secretary of the Army) to build levees (31 ft above sea level) along Lake Okeechobee. Rivers and Harbors Act of 1930, Pub. L. No. 71-520, 46 Stat. 918, 925. Congress would later name this system of levees the Herbert Hoover Dike. 2020_ROD_043924 (citing Flood Control Act of 1960). Thus began the U.S. Army Corps of Engineers' management of Lake Okeechobee. *See Fla. Wildlife Fedn. Inc. v. U.S. Army Corps of Engineers*, 859 F.3d 1306, 1311 (11th Cir. 2017).

In the Rivers and Harbors Act of 1935, Congress solidified the Corps' sole responsibility over the Dike by modifying the construction project "to provide that the **United States shall maintain all project works when completed** and shall bear the cost of all drainage structures heretofore or hereafter constructed in connection with said project . . . ." Rivers

and Harbors Act of 1935, Pub L. No. 74-409, 49 Stat. 1028, 1032 (emphasis added [by the district court]). Pursuant to the 1935 Act, the Corps operated and maintained the culverts, over 83 miles of levee, hurricane gates, St. Lucie Canal, Caloosahatchee River Canal, and the Okeechobee Waterway. 2020_ROD_043925. Despite this massive investment, it still was not enough to adequately protect against flooding. Lecher, *supra*, at 11.

In the Flood Control Act of 1948, Congress initiated the C&SF Project. The 1948 Act stated in pertinent part:

> The project for Caloosahatchee River and Lake Okeechobee drainage areas, Florida, **authorized by the Rivers and Harbors Act of July 3, 1930**, as amended [*i.e.*, the 1935 amendment], is hereby **modified and expanded** to include the first phase of the comprehensive plan for flood control and other purposes in central and southern Florida [*i.e.*, C&SF Project] as recommended by the Chief of Engineers.

80 Pub. L No. 80-858, 62 Stat. 1171, 1176 (emphasis added [by the district court]); *see also* 62 Stat. 1175 (authorizing Corps to preside over C&SF Project "for the benefit of navigation and the control of destructive floodwaters and other purposes . . . . ").

Notably, for purposes of this case, the 1948 Act modified and expanded the Rivers and Harbors Act of 1930, and its 1935 amendment, to include the C&SF

Project. The plain and ordinary meaning of "modified and expanded" is not to repeal. The C&SF Project included the construction and modification of several structures aimed at giving the Corps more control over Lake Okeechobee. 2020_ROD_043936. The C&SF Project is also what allowed the Corps to implement regulation schedules, but it did not direct a specific schedule. *Id*. at 043943. None of this indicates that Congress intended to curtail the Corps' ability to maintain the integrity of the Dike.

Jumping ahead, Congress explained its motivation for modifying the C&SF Project in WRDA 1996 by directing the Corps to:

> [D]evelop . . . a proposed comprehensive plan for the purpose of restoring, preserving, and protecting the South Florida ecosystem. The comprehensive plan shall provide for the protection of water quality in, and the reduction of the loss of fresh water from, the Everglades. The comprehensive plan shall include such features as are necessary to provide for the water-related needs of the region, including flood control, the enhancement of water supplies, and other objectives served by the Central and Southern Florida Project.

WRDA 1996, Pub. L 104-303, 110 Stat 3658, § 528(b)(1)(A)(i).

Dist. Ct. Doc. 76 at 28–31 (J.A. 1413–16) (omissions in original) (footnote omitted).

The Plan, as incorporated in WRDA 2000, is that comprehensive plan that was contemplated in that 1996 legislation. The Plan was designed to build upon the previous efforts (described in the foregoing history) in providing for flood control, water-related needs, and other water management purposes. Thus, the Plan stood on the shoulders of the already existing Lake Okeechobee levees, canals, pumps, and other features of the water management system. The Plan contemplated more than 60 projects, including the EAA Project. The EAA Project was authorized by the Corps in the May 2020 Record of Decision ("ROD"), found in the record at J.A. 842 et seq. WRDA 2000 provided in part:

> [T]he Plan is approved as a framework for modifications and operational changes to the Central and Southern Florida Project that are needed to restore, preserve, and protect the South Florida ecosystem while providing for other water-related needs of the region, including water supply and flood protection.

Pub. L. No. 106-541, § 601(b)(1)(A).

The EAA Project has two components: a 240,000 acre-feet reservoir ("Reservoir") and a 6500-acre storm water treatment area ("STA"). The Reservoir provides additional storage capacity (in addition to that provided by Lake Okeechobee), increases available water supply, and can provide water to be distributed to legal users like Plaintiffs. The Plaintiffs are agricultural entities with irrigation needs and are among those legal users holding permits which entitle them to water supply distributions from Lake Okeechobee, and from the Reservoir.

The other component of the EAA Project is the STA. It consists of 6500 acres which will, when completed, be an engineered wetlands designed to remove phosphorous from the water and address other water quality concerns before allowing the water to flow into the Everglades.  The STA is composed of four phases. Phase I involves "[s]ite preparation, including mechanical cleaning, grubbing vegetation, and demucking, within . . .[a] 340-acre footprint."  Dep't of Army Permit SAJ-2018-03427 (J.A. 471).  Phase II involves construction of canals and levees.  *Id.*  Phase III involves the construction (but not operation) of the 6500-acre treatment area and construction of water control structures and additional pump stations.  *Id.*  Only the initial operations period—i.e. the Operational Testing and Monitoring Period ("OTMP")—is included in Phase III, which is designed to support vegetation grow-in.  *Id.* at J.A. 471–72.  Phase IV, full operation of the STA, will come after completion of the testing and monitoring period (OTMP) and after future authorizations of the Corps.  *Id.* at J.A. 479; *see also* Supplement to Dep't of Army Record of Decision, March 10, 2021, J.A. 547 et seq. and J.A. 555 (referencing the future final operation of Phase IV of the STA).

The two components of the EAA Project are designed to operate in tandem—i.e. simultaneously.  Primarily because of the additional capacity for storage of water (and additional water supply) of the Reservoir, the EAA Project will actually increase the water supply available for legal users like Plaintiffs, as compared to that existing immediately before the EAA Project.

As mentioned above, WRDA 2000 also included the Savings Clause which provides the basis of the Plaintiffs' primary challenge in this case. The Savings Clause provides, in relevant part, as follows:

> NO ELIMINATION OR TRANSFER.—Until a new source of water supply of comparable quantity and quality as that available on the date of enactment of this Act is available to replace the water to be lost as a result of implementation of the Plan, the Secretary and the non-Federal sponsor shall not eliminate or transfer existing legal sources of water, including those for—
>
> (i) an agricultural or urban water supply.

WRDA 2000 § 601(h)(5)(A).

The Regulation Schedule under which the Corps was operating the Lake Okeechobee water management system on the date of enactment, the year 2000, was known the WSE, Water Supply and Environmental Regulation Schedule. That Regulation Schedule provides for a maximum level for Lake Okeechobee of 18.53 feet. The Plaintiffs' position in this case is that this WSE Regulation Schedule reflects the proper quantity of water supply that was "available on the date of enactment." Thus, the Plaintiffs' position in this case that the proper Savings Clause analysis to determine whether a proposed project complies with the Savings Clause— that is, to determine whether there has been an "elimination or transfer [of] existing legal sources of water"—should compare the water supply after the proposed project with the water supply reflected by the WSE Regulation Schedule. In other words, the

Plaintiffs' position in this case is that the WSE Regulation Schedule is the proper baseline which should have been used by the Corps in its Savings Clause analysis to determine whether the EAA Project complies with the Savings Clause.[2]

In 2008, prompted by structural problems with the Dike that had become apparent because of the high water levels in the years preceding 2008, the Corps issued a new Regulation Schedule—LORS 2008[3]—to replace the WSE Regulation Schedule. LORS 2008 provides for a maximum level for Lake Okeechobee of 17.25 feet. The Corps does not dispute the Plaintiffs' contention that LORS 2008 provides for a storage capacity for Lake Okeechobee of approximately 500,000 acre-feet of water less than that provided for by WSE. The Corps' position in this case is that—in its Savings Clause analysis for the EAA Project—it properly used LORS 2008 as the baseline to which to compare water supply that would be available after the EAA Project.

Next, we state and briefly describe the three claims which Plaintiffs have brought to the district court, and now to this Court. We note that Plaintiffs' first claim is the one we describe above as Plaintiffs' primary challenge in this case.

---

[2] The parties and the district court refer to this baseline as the pre-CERP baseline, standing for a baseline extant at the time of the Comprehensive Everglades Restoration Plan (or what we have called simply the Plan). We prefer to use a simpler, more transparent term for what the parties and the district court call the pre-CERP baseline; we use the term: the year 2000 baseline.

[3] LORS 2008 stands for the 2008 Lake Okeechobee Regulation Schedule.

## II.  STATEMENT AND EXPLANATION OF PLAINTIFFS' CLAIMS

First Claim:[4]    Plaintiffs' claim that the Corps violated WRDA 2000's Savings Clause when it approved and authorized the EAA Project using the wrong water supply baseline.

The EAA Project was approved and authorized in May 2020. As described above, the EAA Project included two components: the Reservoir capable of holding approximately 240,000 acre-feet of water, and the STA which was designed to purify water to be released into the Everglades.  The two components were designed to operate only in tandem—i.e. simultaneously.  It is undisputed that—to determine whether there was an "elimination or transfer" of water supply which would trigger the Corps' replacement obligation under by the Savings Clause—the actual Savings Clause analysis used by the Corps compared the water supply after the EAA Project to the water supply and Lake level in 2008—i.e. the LORS 2008 baseline—rather than comparing the same to the water supply and Lake level in 2000—i.e. the year 2000 baseline.  Because the EAA Project actually increases the water supply over and above that existing before the EAA Project (which was the LORS 2008 baseline), the Corps' Savings Clause analysis revealed no such

---

[4] Throughout this opinion, we refer to Plaintiffs' claims as Plaintiffs' first claim, Plaintiffs' second claim, and Plaintiffs' third claim, and we describe these claims in this Part II.

"elimination or transfer" of water supply.  In this first claim, Plaintiffs argue that the Corps violated the Savings Clause by using the LORS 2008 baseline instead of the year 2000 baseline, which they argue is the baseline the Savings Clause requires to be used.  This issue is addressed in Part IV.A. with respect to the standing issue and Part V. with respect to the merits of the issue.

Second Claim:     The Plaintiffs' also claim that the Corps violated WRDA 2000's Savings Clause when it approved and authorized the EAA Project without conducting a separate Savings Clause analysis evaluating the effect on the water supply of the standalone operation of the STA, which was contemplated at the time.

Wholly aside from their argument in their first claim, in their second claim, Plaintiffs argue that, at the time of the May 2020 ROD which approved and authorized the EAA Project, it was contemplated by the Corps that there would be a considerable period of time during which the STA might operate in a standalone manner—i.e. without the simultaneous operation of the Reservoir. Plaintiffs argue that the STA is expected to be completed and tested and ready for full operations in 2025, while the completion, operation, and testing of the Reservoir is not expected until 2029. *See* D.C. Doc. 37 at 5 (J.A. 167) (noting that the delay with respect to the Reservoir is due to funding limitations).  Because the Reservoir is designed to hold a large volume of water (240,000 acre-feet of water) which would increase the water supply available to users like Plaintiffs, Plaintiffs argue that when the STA operates in a

standalone manner (i.e. without the Reservoir) there will be an actual decrease in water supply even as compared to the LORS 2008 baseline.  Plaintiffs argue that, notwithstanding the contemplation that there would be such standalone operation of the STA, the Corps failed to conduct a separate Savings Clause analysis of such standalone operation, and thus violated the Savings Clause.  The jurisdictional issue with respect to Plaintiffs' second claim is discussed below in Parts IV.B. and IV.B.1.

Third Claim:   The Plaintiffs also claim that the Corps violated the National Environmental Policy Act ("NEPA) when the Environmental Impact Statement ("EIS") it conducted to support its authorization of the EAA Project failed to include an evaluation of the effects of the standalone operation of the STA which was contemplated at the time.

As noted above, the Plaintiffs argue that, at the time the Corps authorized the EAA Project, it was contemplated that there would be a considerable period of time during which the STA might operate in a standalone manner.  In this third claim, the Plaintiffs argue that the Corps failed to include in the EIS supporting the EAA Project any evaluation of the effects of such standalone operation, and that that failure violated NEPA.  The Plaintiffs argue that the EIS should have included an issue as important as the contemplated standalone operation of the STA.  The jurisdictional issue with respect to Plaintiffs' third claim is discussed below in Part IV.B. and IV.B.2, and the merits of this issue are discussed in Part VI.

### III. THE CORPS' STANDING (JURISDICTIONAL) CHALLENGE TO EACH OF PLAINTIFFS' CLAIMS

The Corps argued below, and argues on appeal, that the Plaintiffs lack Article III standing to bring any of their claims. We address this standing (jurisdictional) issue, addressing the issue separately with respect to each of Plaintiffs' claims. We address the standing issue with respect to Plaintiffs' first claim in Part IV.A. We address the jurisdictional issue with respect to Plaintiffs' second claim in Part IV.B. and IV.B.1. We address the jurisdictional issue with respect to Plaintiffs' third claim in IV.B. and IV.B.2.

### IV. THE JURISDICTIONAL ISSUES

We first address the Corps' argument that Plaintiffs lack standing to bring their first claim—i.e. that the Corps violated the Savings Clause when it authorized the EAA Project. Then we address the Corps' argument that Plaintiffs lack standing to bring their second and third claims—i.e. that the Corps violated the Savings Clause and NEPA when it conducted Savings Clause and NEPA analyses without evaluating the effects of the standalone operation of the STA which was contemplated at the time.

A. *The standing issue with respect to Plaintiffs' first claim that the Corps violated the Savings Clause when it authorized the EAA Project using the wrong water supply baseline.*

Article III of the United States Constitution limits the jurisdiction of federal courts to cases or controversies. U.S. Const. art. III, § 2, cl. 1. Article III's standing requirements are well established:

> [T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). We review the issue of standing de novo. *Lowman v. Fed. Aviation Admin.*, 83 F.4th 1345, 1355 (11th Cir. 2023).

The Corps' only challenge to the Plaintiffs' standing to bring this first claim involving the proper baseline is their argument that Plaintiffs cannot demonstrate an injury-in-fact. To understand this standing issue, it is necessary to recognize the gist of Plaintiffs' claim on the merits, and the gist of the Corps' argument that Plaintiffs' lack standing.

Although Plaintiffs' first claim is described more fully in Part V., we set out now the gist of the Plaintiffs' claim challenging the Corps' authorization of the EAA Project because the Corps'

Savings Clause analysis used the wrong baseline. The Plaintiffs interpret the Savings Clause to provide for users like Plaintiffs an entitlement to a certain level of water supply. They interpret the Savings Clause to prohibit the Corps from taking any action that constitutes an "elimination or transfer" of water supply available for users like Plaintiffs "[u]ntil a new source of water supply of comparable quantity and quality as that available on the date of enactment of this Act [the year 2000] is available to replace the water to be lost as a result of implementation of the Plan." WRDA 2000 § 601(h)(5)(A). The Plaintiffs argue that the EAA Project transfers water (e.g. from Lake Okeechobee to the proposed Reservoir) and thus—even though it actually provides some increase in water supply as compared to the status quo—triggers the Corps' replacement obligation under the Savings Clause. And because the Plaintiffs also interpret LORS 2008 as an "implementation of the Plan" and thus within the scope of the Corps' replacement obligation, the Plaintiffs argue that the Corps must replace water supply up to the year 2000 level. In other words, Plaintiffs argue that the EAA Project triggered the Corps replacement obligation and that replacement obligation included replacing the loss of water supply reflected by LORS 2008—i.e. replacing water supply up to the year 2000 level. Thus, Plaintiffs' position on the merits is that—to determine whether there has been a transfer of water triggering the Corps' replacement obligation under the Savings Clause and a prohibited transfer in violation thereof—the water supply available after the EAA Project must be compared to the water supply that existed in the year 2000. Accordingly, the Plaintiffs' position on the

23-11683                Opinion of the Court                17

merits of their first claim is that the Corps' Savings Clause analysis should have used the year 2000 baseline, rather than the LORS 2008 baseline.[5]

Next, we set out the gist of the Corps' argument that the Plaintiffs lack standing to bring their first claim involving the proper baseline. The Corps points out that this first claim of Plaintiffs challenges the Corps' authorization of the EAA Project, which includes two components—the Reservoir and the STA, which are designed to operate in tandem. The Corps argues that this EAA Project actually increases water supply; i.e. primarily because of the new Reservoir and its capacity to store an additional 240,000 acre-feet of water, the EAA Project increases the water supply as compared to that existing immediately before the Project. Thus, the Corps argues that Plaintiffs will suffer no injury-in-fact because of

---

[5] The following statement at pages 6–7 of the Reply brief of Plaintiff-Appellant United States Sugar Corporation confirms that the foregoing correctly describes the merits position of the Plaintiffs with respect to their first claim:

> The proper baseline against which to measure available water supply is the fixed baseline set forth in the Savings Clause, and if the Corps wants to proceed with a Plan project when the supply is below that baseline, the Corps must identify "a new source of water supply of comparable quantity and quality" to restore the statutory baseline . . . a modest improvement over the status quo is insufficient.

See also Okeelanta Reply brief at 2 ("In arguing that Okeelanta lacks standing, the Corps' brief ignores the fact that it is transferring water supply that the company is entitled to receive.").

this Project; they will suffer no actual loss of water as compared to the status quo.

The district court correctly recognized the Corps' challenge to Plaintiffs' standing to bring their first claim as conflating the standing inquiry with the merits inquiry. In other words, the Corps argues that Plaintiffs will lose on the merits of their first claim and thus have no injury-in-fact. As noted above, Plaintiffs' merits argument is that the EAA Project transfers water to which they are entitled, thus triggering the Corps' obligation under the Savings Clause to replace water supply up to the year 2000 level to which users like Plaintiffs are entitled. The district court correctly recognized the Corps' standing challenge as merely an argument that Plaintiffs will lose on the merits: that is, the Corps argues that Plaintiffs are entitled only to the quantity of water supply reflected by LORS 2008—not that quantity available in the year 2000.[6]

The problem with the Corps' standing argument is the well-established law: "For standing purposes, we accept as valid the merits of appellees' legal claims, so we must assume that the loan-repayment limitation . . . unconstitutionally burdens speech." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 298 (2022); *see also Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is

---

[6] The district court characterized the Corps' standing argument as follows: the Corps argues "that Plaintiffs lack an injury-in-fact because a reduction in water supply *of water to which they are not entitled* is not an injury-in-fact." Dist. Ct. Doc. 37 at 11 (J.A. 173).

illegal . . . ."). Accepting Plaintiffs' legal claim as valid, Plaintiffs obviously will suffer an injury-in-fact. Assuming their first claim (involving the baseline issue) is valid, Plaintiffs obviously would be entitled to substantially more water supply than the EAA Project provides, an obvious injury-in-fact. Similarly, the other standing requirements would clearly be satisfied. The loss of water supply to which Plaintiffs claim to be entitled is clearly concrete, particularized, imminent, and traceable to the Corps' transfer of water supply which triggers Plaintiffs' entitlement under the Savings Clause as they interpret it. Similarly, with respect to redressability, we recognize that Plaintiffs are claiming a violation of a procedural right—i.e. to require the Corps to use the proper procedure (using the proper baseline). And it is well-established that a plaintiff seeking to enforce a procedural right "can assert that right without meeting all the normal standards for redressability . . . . When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. E.P.A.*, 549 U.S. 497, 517–18 (2007).

We conclude that all of the standing requirements are satisfied with respect to Plaintiffs' first claim challenging the EAA Project and involving the proper baseline. The Corps' standing challenge to the Plaintiffs' first claim (involving the proper baseline) fails because the Corps improperly conflated the standing inquiry with the merits inquiry. Accordingly, we affirm the district court's decision holding that Plaintiffs have standing to bring this claim.

B. *The jurisdictional issues with respect to Plaintiffs' second and third claims—that the Corps violated the Savings Clause and NEPA when it conducted its Savings Clause and NEPA analyses without evaluating the effects of the standalone operation of the STA, which was contemplated at the time.*

We now turn to the Corps' challenge to Plaintiffs' standing to bring their second and third claims, which focus on the standalone operation of the STA. The Corps' argument is that Plaintiffs lack standing for their second and third claims because the standalone operation of the STA—about which they complain—has never been authorized. The Corps argues that numerous regulatory actions requiring future decisions of the Corps and other agencies—e.g. project operation manuals, permits, etc., including future Savings Clause and NEPA analyses—will be required before any standalone operation of the STA will be authorized and can occur.

Although the Corps couches its argument in terms of standing, the substance of its argument goes to ripeness. The district court recognized that the Corps' argument suggested ripeness, but declined to address ripeness. Dist. Ct. Doc. 37 at 17 n.11 (J.A. 179). Unlike the district court, we construe the Corps' argument as a challenge to the ripeness of Plaintiffs' second and third claims involving the standalone operation of the STA. [7]

---

[7] We review our own jurisdiction to hear a case, including questions of ripeness, *sua sponte*. *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 n.7 (11th Cir. 1989).

We first address the law of ripeness and finality.  Then, recognizing that Plaintiffs' second and third claims involve Plaintiffs' argument that the Corps violated the Savings Clause and NEPA with respect to a decision to authorize the standalone operation of the STA, we examine the extensive record in this case to determine whether the Corps has made a final (ripe) decision to authorize the standalone operation of the STA.  Then, we address the significance of our decision for Plaintiffs' second claim (Part IV.B.1.) and for Plaintiffs' third claim (Part IV.B.2).

We review subject matter jurisdiction *de novo*.  *Digital Props., Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997).  We have described the ripeness doctrine, *e.g. Pittman v. Cole*, 267 F.3d 1269, 1278 (11th Cir. 2001), in terms similar to the Supreme Court's description:

> As this Court has previously pointed out, the ripeness requirement is designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–149, 87 S. Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).

> In deciding whether an agency's decision is, or is not, ripe for judicial review, the Court has examined both the "fitness of the issues for judicial decision" and the "hardship to the parties of withholding court

consideration." *Id.*, at 149, 87 S. Ct., at 1515. To do so in this case, we must consider: (1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented.

*Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732–33 (1998). And, as we pointed out in *Alabama Power Co. v. U.S. Dep't of Energy*, 307 F.3d 1300, 1311 n.10 (11th Cir. 2002) (citing 16C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 3942 (2d ed. 1996)): "[o]ne can see how ripeness doctrine overlaps with yet another doctrine: finality." *See also* Administrative Review, 13B Fed. Prac. & Proc. Juris. § 3532.6 (3d ed.) ("The close relationship to finality results in many ripeness decisions that emphasize the finality of administrative action."). Of course, under the Administrative Procedure Act, judicial review is available only for final actions. As the Supreme Court held in *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted):

> As a general matter, two conditions must be satisfied for agency action to be "final": First, the action must mark the "consummation" of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."

As the Wright and Miller treatise notes: "This two-prong framework rapidly became the 'black letter' standard." Finality, 33 Fed. Prac. & Proc. Judicial Review § 8361 (2d ed.). Thus, as the D.C. Circuit has held: "No final administrative decision, no judicial review." *State of Cal. v. Dep't of Just.*, 114 F.3d 1222, 1225 (D.C. Cir. 1997).

We now turn to our examination of the extensive administrative record in this case to determine whether or not the Corps has made a final (ripe) decision to authorize the standalone operation of the STA on which the Plaintiffs' second and third claims focus. After careful consideration of the briefs and the relevant part of the record, we agree with the Corps and conclude that there has been no final decision of the Corps authorizing operations of the STA beyond the testing and monitoring stage, the Operational Testing and Monitoring Period (OTMP), which Plaintiffs do not challenge. The only documents cited by the Plaintiffs as relevant to the ripeness issue—i.e. relevant in determining whether or not the Corps has made a final decision authorizing the standalone operation of the STA—are the April 2020 ROD (J.A. 433 et seq.), the May 2020 ROD (J.A. 842 et seq.), and the March 10, 2021 "Supplement to . . . ROD" (J.A. 547 et seq.) (which is a supplement to the May 2020 ROD), as well as attachments to the April and May 2020 RODs.

The April 2020 ROD clearly is not a final decision authorizing the standalone operation of the STA. It was signed on April 17, 2020 (J.A. 465), and it approved the issuance of a Department of

the Army Permit of the same date.  That Permit is found at J.A. 471 et seq.  It describes—in its section entitled "Project Description (J.A. 471)—the Phases of the STA which are being addressed in the Permit, and thus the phases that are being addressed in the April 2020 ROD.  The Phases that are being addressed include only Phase I (site preparation), Phase II (construction of canals and levees "to minimize seepage flows to adjacent lands," J.A. 471), and Phase III (which includes "only the initial operation period referenced as the Operational Testing and Monitoring Period (OTMP)," J.A. 472). The Permit expressly provides, at J.A. 479:

> The Permittee shall not operate the STA beyond what is described in the project description [i.e. Phase III] until written authorization is granted by the Corps subject to a future permit evaluation and modification and a National Pollutant Elimination System (NPDES) permit has been received. A minimum of six months prior to planned operation of the facility, the Permittee shall submit an operation plan to the Corps for review and approval. The National Environmental Policy Act analysis for the project will be updated to reflect the operations plan and coordinated for public and agency review as appropriate.

In other words, the Permit is very clear that the April 2000 ROD does not authorize any operation of the STA beyond Phase III, the testing and monitoring period which Plaintiffs do not challenge. Indeed, the Permit expressly prohibits the full operation of the STA (Phase IV) until future actions have occurred, some of which are subject to public review.

Similarly, the May 2020 ROD did not authorize the standalone operation of the STA. It addressed considerations relevant to Phases I and II of the STA. And the construction of Phase III was not authorized until March 10, 2021.

Plaintiffs[8] point to the March 10, 2021, "Supplement to the . . . Record of Decision" as the strongest support for their position that there is a decision of the Corps authorizing the standalone operation of the STA. Plaintiffs assert that in "March 2021, the Corps modified the Section 404 permit to authorize the last phase of the STA," Okeelanta's Reply brief at 11 (citing J.A. 549–54). We have carefully considered this March 10, 2021, document, which appears in the Joint Appendix at J.A. 547–56. Contrary to Plaintiffs' assertions that that March 10, 2021, document "modified the Section 404 permit to authorize the last phase of the STA," the document actually addressed only SFWMD's "Proposed Permit Modification" to "modify the permit to begin construction of Phase III." J.A. 548. Indeed, the March 10, 2021, document expressly provides: "Therefore, the modification to the DA permit is for the construction of Phase III only." J.A. 549. And, as we saw above, Phase III includes merely the testing and monitoring period; it is not the standalone operation of the STA that Plaintiffs challenge.

We realize that there is some language in that March 10, 2021, document which might suggest that the Corps is

---

[8] *See* Okeelanta's Reply brief at 11.

contemplating allowing a full and standalone operation of the STA,[9] as soon as the SFWMD applies for and receives a Section 401 (Clean Water Act) water quality certificate from the Florida Department of Environmental Protection, submits same "to the Corps for review under [the] Clean Water Act" (J.A. 554), and "receives written notification from the Corps that the WQC requirements have been satisfied" (J.A. 556). The March 10, 2021, document does not mention any need for a Savings Clause analysis. For this reason, Plaintiffs assert: the document "suggested that the only reason it was not authorizing [the standalone] operations was because it was waiting for a water quality certification from the FDEP." Okeelanta Reply brief at 11. There are several reasons that we do not believe this language indicates that there has been a final and ripe decision by the Corps to authorize the standalone operation of the STA. Even if that language meant that the Corps was contemplating allowing the standalone operation of the STA (rather than meaning merely the operation of Phase III, i.e. actually conducting the testing and monitoring of the system) upon receipt

_____

[9] That language of the March 10, 2021, document is as follows:

> In accordance with the requirements set forth in 40 CFR 121.1 et seq., the SFWMD must obtain Section 401 water quality certification (WQC), or a waiver from the certification requirement, for operations of the A2-STA as described in the Final Operations Plan for A2-STA Phase IV. . . . Build-out operation of the STA shall not occur until the SFWMD receives written notification from the Corps that the WQC requirements have been satisfied.

J.A. 555–56.

only of that WQC, as well as its own approval thereof, that does not constitute a final and ripe decision of the Corps to authorize standalone operation of the STA. To the contrary, it is a mere contemplation of a future action; it is not a "final" action; it does not "mark the consummation of the agency's decisionmaking process." *Bennett*, 520 U.S. at 177–78. In other words—and notwithstanding the contemplation of future Corps action—the March 10, 2021, document was not a final decision of the Corps authorizing the standalone operation of the STA (which apparently would be Phase IV operations). To the contrary, the document expressly provided: "[T]he Corps is not approving operations at this time. Therefore, the modification to the DA permits is for the construction of Phase III only." J.A. 549.

We next address the significance of the foregoing discussion and our conclusion that there has been no final, ripe decision authorizing the standalone operation of the STA. We address first the significance for Plaintiffs' second claim and then for Plaintiffs' third claim.

> 1. *Significance for Plaintiffs' second claim: i.e. Plaintiffs' claim challenging the Corps' failure to conduct a Savings Clause analysis evaluating the effects on water supply of any standalone operation of the STA.*

We readily conclude that Plaintiffs' second claim challenges a purported decision of the Corps which is not final; therefore Plaintiffs' second claim challenging the failure of the Corps to conduct a Savings Clause analysis of a standalone operation of the STA is not ripe. As demonstrated above, there has been no decision by

the Corps approving or authorizing such standalone operation—no decision at all, much less a final decision marking the consummation of the agency's decision-making process (*Bennett v. Spear*'s first requirement for a final decision). Moreover, Plaintiffs have also failed to satisfy the second requirement of *Bennett v. Spear* for a final decision: Plaintiffs have failed to establish that the Corps' action determined any rights or obligations relating to any standalone operation of the STA from which legal obligations will flow. The only relevant decision of the Corps revealed by the administrative record is that there shall be no standalone operation of the STA until some future decision of the Corps. As discussed above, the April 17, 2020, Permit expressly prohibited any operations of the STA beyond the Phase III testing and monitoring period, which Plaintiffs do not challenge. That Permit expressly provided that any operation of the STA beyond Phase III must await future "written authorization by the Corps subject a future permit evaluation and modification" and subject to SFWMD's submission to the Corps of "an operation plan . . . for review and approval." Moreover, the Permit expressly required that SFWMD operation plan must be supported by NEPA analysis "coordinated for public and agency review as appropriate." *See, supra*, Part IV.B., for full quotation of this express prohibition in the Permit.

Couched in the terminology of ripeness, Plaintiffs' second claim fails the first ripeness requirement—i.e. that the claim be fit for judicial review. *Ohio Forestry Ass'n*, 523 U.S. at 733. The Plaintiffs' claim—that the Corps violated the Savings Clause because it failed to conduct a Savings Clause analysis of the standalone

operation of the STA—challenges a purported decision of the Corps that does not exist and therefore is not final and is not fit for judicial review. With respect to the second prong of ripeness—"hardship to the parties of withholding court consideration," *id.* (internal citation omitted)—we cannot conclude that there is sufficient harm to Plaintiffs to make Plaintiffs' second claim ripe. As noted, no rights of the Plaintiffs have been determined from which legal obligations will flow. Also as noted, before any standalone operation of the STA can occur, there must be a future decision of the Corps preceded by an opportunity for the Plaintiffs' input during "public and agency review," and Plaintiffs can challenge any such future decision. Moreover, for any project, the Regulations require the preparation of a Project Implementation Report ("PIR") which must include an "analysis pursuant to the Savings Clause." Dist. Ct. Doc. 37 at 3 (J.A. 165) (citing 33 C.F.R. § 385.36(a)). In other words, Plaintiffs will have "ample opportunity later to bring [their] legal challenge at a time when harm is more imminent and more certain." *Pittman*, 267 F.3d at 1281 (quoting *Ohio Forestry*, 523 U.S. at 734).

Accordingly, the district court erred in failing to recognize that Plaintiffs' second claim was not ripe; to this extent the judgment of the district court is reversed and remanded. We instruct

the district court on remand to dismiss Plaintiffs' second claim for lack of finality and ripeness.[10]

> ### 2. Significance (of the fact that there has been no final, ripe decision authorizing the standalone operation of the STA) for Plaintiffs' third claim: i.e. Plaintiffs' claim challenging the Corps' failure to conduct a NEPA analysis evaluating the effects of any standalone operation of the STA.

The Plaintiffs' third claim may be a little different. In responding to the Corps' argument that there has been no decision authorizing any standalone operation of the STA, Plaintiffs argue that, even if there has been no such decision, there was nevertheless a NEPA violation because the Corps violated NEPA when the Corps made the decision in May 2020 to authorize the EAA Project, and its supporting EIS failed to include an evaluation of the standalone operations of the STA. Relying on anti-segmentation principles, the Plaintiffs argued that "improper segmentation violations (and injury therefrom) do not have to await formal approvals." United States Sugar Reply brief at 25.[11] In other words, Plaintiffs argue that the decision that indisputably was made in the May 2020 ROD was in violation of NEPA because the supporting EIS

---

[10] In light of our decision with respect to finality and ripeness, we do not address the Corps' standing challenge to this second claim of Plaintiffs, nor the district court's ruling with respect thereto.

[11] To the same effect, see Okeelanta Reply brief at 8: "[E]ven if it were correct [that the Corps has not yet approved the standalone operation of the STA], Okeelanta has still suffered an injury as a result of the Corps' improper segmentation of its NEPA analysis."

violated the anti-segmentation principles by failing to include an evaluation of the effects of the standalone operation of the STA, which Plaintiffs argue was contemplated at that time.

Our circuit has adopted a special ripeness rule for NEPA. In *Ouachita Watch League v. Jacobs*, 463 F.3d 1163 (11th Cir. 2006), we held that:

> NEPA adds an important twist [to ripeness]. In a NEPA suit, the issue presented for review typically is whether the agency has complied with the statute's particular procedures. Because of the rather special nature of the injury (that is, the failure to follow NEPA), *the issue is ripe at the time the agency fails to comply.* "Hence a person with standing who is injured by a failure to comply with the NEPA procedure *may complain of that failure at the time the failure takes place, for the claim can never get riper.*" *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737 (1998). As we see it, that is the end of the proper ripeness analysis in a NEPA suit.

*Id*. at 1174 (emphases added). We also explained that, with respect to NEPA challenges, "[i]t is well settled that a final EIS or the record of decision issued thereon constitute final agency action." *Id*. at 1173 (alteration accepted) (emphasis added) (citation and quotation marks omitted).

Here, the Corps has prepared a Final EIS (and adopted that EIS in its May 2020 ROD), the adequacy of which Plaintiffs challenge. Under our precedent regarding ripeness in the NEPA

context, this is enough to render the claim ripe.  Because the Plaintiffs' third claim is ripe, we address its merits in Part VI.

## V. MERITS OF PLAINTIFFS' FIRST CLAIM—I.E. PLAINTIFFS' CLAIM THAT THE CORPS VIOLATED WRDA 2000'S SAVINGS CLAUSE WHEN IT APPROVED AND AUTHORIZED THE EAA PROJECT USING THE WRONG WATER SUPPLY BASELINE

We turn now to the merits of Plaintiffs' first claim. The Plaintiffs argue that the district court erred when it rejected Plaintiffs' position that the EAA Project violates the Savings Clause.  As described above,[12] the Plaintiffs interpret the Savings Clause to provide for legal users of water supply like Plaintiffs an entitlement to a certain level of water supply tied to that available in the year 2000. They interpret the term "transfer" in the Savings Clause to include any "transfer" of water supply available to them, whether or not such "transfer" actually decreases water supply available to them. The Plaintiffs' position is that the EAA Project transfers water supply that is available for users like Plaintiffs—e.g. the proposed transfer of water from Lake Okeechobee to the proposed Reservoir. They argue that such "transfer" triggers the Corps' obligation under the Savings Clause to replace water lost "as a result of implementation of the Plan" up to the year 2000 level.  They argue that LORS 2008—which substantially reduced water supply—was such

---

[12] *See* discussion above in Part IV.A.

an "implementation of the Plan," and therefore the water lost was lost "as a result of implementation of the Plan." Thus, Plaintiffs argue, authorization of the EAA Project triggered the Corps' obligation to replace water supply up to the year 2000 level, even though the EAA Project itself caused no loss of water supply (actually increasing same).[13] Stated another way, Plaintiffs' position is that the Savings Clause analysis used by the Corps—i.e. the analysis used to determine whether the EAA Project satisfied the Savings Clause—erroneously compared the water supply available after the EAA Project to the LORS 2008 baseline, rather than to the year 2000 baseline, thus relieving the Corps of its obligation under the Savings Clause to replace water supply to the year 2000 level.

The issue presented to the district court—and now to us—is whether—in its analysis to determine whether the EAA Project satisfied the Savings Clause—the Corps properly compared the water available after the EAA Project to the LORS 2008 baseline, or whether the comparison should have been made to the year 2000 baseline, as the Plaintiffs urge. The district court—interpreting the plain language of the Savings Clause—held that the proper

---

[13] It is this entitlement theory that makes it possible for Plaintiffs to take the strange position they take in this case—i.e. that the EAA Project violates the Savings Clause and injures them notwithstanding the fact that the EAA Project actually increases, rather decreases, water supply available to them. We hold below that—even if such a "transfer" could trigger the Corps' replacement obligation under the Savings Clause—the Corps has no obligation to replace the loss of water supply about which the Plaintiffs complain—i.e. the approximately 500,000 acre-feet loss of water caused by the integrity problems of the Dike. .

comparator was the LORS 2008 baseline.    Under 5 U.S.C.
§ 706(2)(A), courts review agency actions under the Administrative
Procedure Act and hold them unlawful if found to be "arbitrary,
capricious, an abuse of discretion, or otherwise not in accordance
with law." *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d
1257, 1264 (11th Cir. 2009) (quoting the statute and holding also
that we employ the same standard as the district court).

The significance of this issue for the resolution of this case
is apparent from the following facts.  In 2008, prompted by struc-
tural integrity problems with the Dike that became apparent be-
cause of the high water levels in years preceding 2008, the Corps
issued a new regulation schedule, LORS 2008, which reflected a
loss[14] of water supply available to users like Plaintiffs, as compared
to that available under the previous regulation schedule, WSE.  The
WSE regulation schedule was extant on the date of enactment of
WRDA 2000 and is the year 2000 baseline which Plaintiffs urge is
the proper comparator for the Savings Clause analysis which
should be applied to the EAA Project.  Although the EAA Project
actually increases the water supply available to users like Plaintiffs
as compared to that available immediately prior to the Project,
there would still be a shortfall as compared to the year 2000 base-
line, i.e. a shortfall of approximately 250,000 acre-feet of water.

The Savings Clause provides, in relevant part:

---

[14] The loss is estimated to be approximately 500,000 acre-feet of water or a
reduction in the maximum level for the Lake from 18.53 feet to 17.25 feet.

> NO ELIMINATION OR TRANSFER.—Until a new source of water supply of comparable quantity and quality as that available on the date of enactment of this Act is available to replace the water to be lost as a result of implementation of the Plan, the Secretary and the non-Federal sponsor shall not eliminate or transfer existing legal sources of water, including those for—

> (i) an agricultural or urban water supply;

WRDA 2000 § 601(h)(5)(A).

Focusing upon the language of the Savings Clause which imposes on the Corps the obligation "to replace water to be lost as a result of the Plan," the district court held that "the Corps does not now violate the Savings Clause by using LORS 2008 as the baseline for the EAA Project." Dist. Ct. Doc. 76 at 34 (J.A. 1419). The district court's reason was: "in scenarios in which Lake Okeechobee's water level threatens the structural integrity of the Herbert Hoover Dike, the Corps is not prohibited—at least by WRDA 2000's Savings Clause—to take appropriate remedial actions." *Id.* at 15 (J.A. 1400). This is because the replacement obligation imposed by the Savings Clause on the Corps "states that it only applies 'as a result of implementation of the Plan.'" *Id.* at 16 (J.E. 1401) (quoting § 601(h)(5)(A)). Thus, the district court held that water supply lost as a result of—i.e. caused by—events or actions that do not constitute "implementations of the Plan" are not subject to the Corps' replacement obligation. "Everything else is not the Plan. At minimum, this must mean—and Plaintiffs *do not* dispute [this]—that

non-Plan actions/events (or as the Corps calls it, 'intervening non-CERP activities') are excluded.  Examples that the Parties agree on are acts of nature . . . ."  *Id.* at 17 (J.A. 1402) (internal quotations omitted); *see also id.* (district court's hypothetical of a relentless drought illustrating that the Corps has no obligation to replace a water supply loss caused by an act of nature).

Having established that the Savings Clause, and the replacement obligation it imposes on the Corps, applies only to water supply lost as a result of "implementation[s] of the Plan," the district court addressed and rejected the Plaintiffs' argument that LORS 2008 was an "implementation of the Plan" and therefore triggered the Corps' obligation to replace the losses of water since the year 2000, as reflected in LORS 2008.  The district court pointed out that, after the hurricanes of 1926 and 1928 caused massive flooding of Lake Okeechobee and killed approximately 3000 people, Congress in 1930 passed the Rivers and Harbors Act of 1930 authorizing the construction of what later became known as the Herbert Hoover Dike.  *Id.* at 29 (J.A. 1414).  That legislation and later legislation in 1935 vested in the Corps "sole responsibility over the Dike."  *Id.*  As the district court pointed out, the Corps' management authority to maintain the Dike derives from that earlier legislation—not from WRDA 2000.[15]  And the district court, at pages

---

[15] After reciting the concise history leading up to the development of the Plan, the district court concluded:  "At no time has Congress indicated that it intended for the Plan to override the Corps' pre-existing  authority to maintain the structural integrity of the Dike."  Dist. Ct. Doc. 76 at 31 (J.A. 1416).

23–28 of its opinion (J.A. 1408–13), demonstrated that "LORS 2008 was not an 'implementation of the Plan,'" *id.* at 28 (J.A. 1413), because LORS 2008 was an action of the Corps to "ensure the structural integrity of the Dike," *id.* at 25 (J.A. 1410)—i.e. an exercise of its authority to maintain the Dike—and because the Plan's operational features do not include the Corps' activities in maintaining the Dike, the authority for which derived from the previous legislation, not from the Plan.  The district court held:

> In adopting LORS 2008, the Corps stated that "[t]he issue of public health and safety, related to concerns regarding the integrity of the Herbert Hoover Dike (HHD) surrounding the lake, is the dominant factor in the decision making process to select a preferred alternative regulation schedule." 2020_ROD_042274. The Corps further stated that "the heightened concern with [the Dike] was emphasized after several hurricanes passed through south Florida during 2004 and 2005, as well as the levee damage around New Orleans caused by Hurricane Katrina in 2005." *Id.* at 042303.  The Corps determined that under the then-current regulation schedule, WSE, the likelihood of the Dike breaking in a high-water event was 55%. *Id.* The Corps issued LORS 2008 through notice and comment rulemaking.  2020_ROD_042277.

*Id.* at 27–28 (J.A. 1412–13); *see also id.* at 27 (J.A. 1412) ("[T]he Corps lowered Lake Okeechobee's water level (because it was concerned that the Dike might break and put in harm's way nearby residents) . . . .").

After extensive oral argument held on November 20, 2024, and after a careful review of the opinion of the district court, the briefs of the parties, and the relevant parts of the extensive record, we agree with the district court that the Corps did not violate the Savings Clause in approving the EAA Project. We agree with the district court that the plain language of the Savings Clause unambiguously provides that the replacement obligation imposed on the Corps extends only to the replacement of water supply lost as a result of an "implementation of the Plan." The issue is one of causation: was the water loss about which Plaintiffs complain[16] caused by an "implementation of the Plan," or by some other event. It is clear—and the Plaintiffs have not argued otherwise—that an act of nature is not an "implementation of the Plan"; for example, a water supply loss caused by a hurricane's damage to the Dike is not water that the Corps must replace under the replacement obligation of the Savings Clause.

As demonstrated above, the district court in effect held that LORS 2008 merely reflected the water loss caused by integrity problems of the Dike; LORS 2008 was an "appropriate remedial action" in response to the threat to the "structural integrity of the . . . Dike." *Id.* at 15 (J.A. 1400). Thus, the district court held that

---

[16] As explained above, the water loss which Plaintiffs seek to require the Corps to replace is the approximately 500,000 acre-feet of water that Plaintiffs claim would be available under the year 2000 baseline (WSE) as compared to the LORS 2008 baseline. This water loss is also described in terms of the maximum lake level under the WSE regulation schedule (18.53 feet) as compared to that under LORS 2008 (17.25 feet).

that water loss was not caused by an "implementation of the Plan," and therefore was not water that the Corps was obligated to replace under the Savings Clause. We agree. The integrity problems of the Dike to which LORS 2008 was a response clearly do not constitute an "implementation of the Plan," and the water loss resulting therefrom is not water that the Corps is obligated to replace.

It is significant that, in their briefs on appeal, none of the Plaintiffs challenge the district court's holding that LORS 2008 was an appropriate remedial action in response to the threats to the structural integrity of the Dike. *See id.* They do not dispute the fact that there were actual problems with respect to the structural integrity of the Dike, or the magnitude thereof. The Plaintiffs do not challenge the findings of the Corps that, under the 18.53-foot Lake elevation allowed by the WSE regulation schedule, there would be a 55% probability of a breach in the Dike. Significantly, Plaintiffs make no argument, and cite no evidence to suggest, that the Corps miscalculated the risks posed by the integrity problems of the Dike. They make no argument, and cite no evidence to suggest, that the Corps could have—consistent with legitimate safety concerns—provided for a regulation schedule which would have allowed for a larger capacity for the Lake or a higher Lake level than the 17.25-foot level provided for in LORS 2008.

Our careful review of this extensive record confirms that the district court's summary judgment opinion (Dist. Ct. Doc. 76, J.A. 1386 et seq.) correctly read the administrative record to indicate that LORS 2008 merely reflected the loss of water supply caused by

the integrity problems of the Dike; we agree with the district court that LORS 2008 was an appropriate response to the threat to the Dike. For example, the Final Supplemental Environmental Impact Statement—prepared in November 2007 as part of the Corps' process in developing the LORS 2008 regulation schedule—repeatedly emphasizes the structural problems with the Dike and the seriousness thereof. In the Executive Summary of that November 2007 EIS, the Corps noted:

- "These extended periods of high water levels within lake Okeechobee have been identified as causing stress to the structural integrity of the HHD that surrounds the lake." J.A. 1206.

- "Since implementation of the WSE schedule [in 2000], it has been determined that improvements to performance of the regulation schedule could be achieved. In 2003–2005, Lake Okeechobee experienced consecutive very wet summers. . . . In order to improve lake operations under the unusually-wet conditions, a series of operational deviations [from WSE] were approved and implemented between 2003 and 2006. Even under the operational deviations, Lake Okeechobee still experienced continued high water levels that posed structural Integrity and public safety Issues with the HHD . . . . [I]n 2005, the Lake Okeechobee Regulation Schedule Study (LORSS) was initiated which focused on alternative schedules designed to lower the normal operating limits of Lake Okeechobee. . . . After the study was

initiated, the need to manage Lake Okeechobee at lower levels was driven primarily by structural integrity issues with the HHD levee system that protects the surrounding communities from flood damage." J.A. 1206–07.

And the "Project, Purpose and Need" part of that same November 2007 EIS even more explicitly indicates that the new regulation schedule which this EIS was supporting—which became LORS 2008—merely reflects the water supply lost as a result of the integrity problems of the Dike. For example, this section of the EIS stated:

- "A major concern with the present regulation schedule, WSE, is the structural stability of the HHD during high water stages. As such, a decision was made to only evaluate alternative plans that triggered maximum regulatory releases one-foot lower than the WSE regulation schedule requirement. The heightened concern with HHD was emphasized after several hurricanes passed through south Florida during 2004 and 2005, as well as the levee damage around New Orleans caused by Hurricane Katrina in 2005. Prior to these devastating hurricanes, the Corps conducted a lengthy study of the HHD condition which resulted in a 1999 report titled "Major Rehabilitation Evaluation Report" (MRR). This report documents the condition of the dike, and identifies needed repairs. A table within the MRR identifies the combined probability of levee breach at different lake

elevations.  Under WSE (elevation 18.53 ft.), there is a 55% probability of levee breach."  J.A. 1213.

In sum, the Plaintiffs do not fairly raise a challenge to the fact that LORS 2008 reflects the loss of water supply caused by the integrity problems of the Dike or point to evidence that might rebut same.  And in any event, we agree with the district court that the record demonstrates that LORS 2008 was an appropriate remedial action in response to the threats to the structural integrity of the Dike.[17]

We also hold that the Corps' use of the LORS 2008 baseline to determine whether the EAA Project satisfies the Savings Clause is a reasonable way to reflect the fact that the Corps—in approving the EAA Project—was not required to replace water supply lost as a result of the integrity problems of the Dike.[18]  The Plaintiffs offer

---

[17] Common sense also supports the fact that the loss of water supply about which Plaintiffs complain (i.e. the 500,000 acre-feet of water) was not caused by actions of the Corps which constitute an "implementation of the Plan." The integrity problems of the Dike were caused by the "extended periods of high water levels within Lake Okeechobee . . . identified as causing stress to the structural integrity of the Dike." *See* J.A. 1206.  LORS 2008 simply reflected that loss of water supply; it was "an appropriate remedial action" in response to the weather conditions.  Dist. Ct. Doc. 76 at 15 (J.A. 1400).

[18] In substance, the Corps' reasoning was the same, although the Corps used different terminology.  The Corps reasoned that LORS 2008 reflected intervening non-CERP activities, and that the Corps did not have an obligation under the Savings Clause to replace losses of water supply caused by such intervening non-CERP activities.  *See* Post Authorization Change Report, March 2018, Annex B, Section B.2.2 (J.A. 814–20) (Savings Clause analysis supporting the Corps' authorization of the EAA Project).  What the Corps meant by

no explanation as to why this use of LORS 2008 as the baseline is not a reasonable way to implement the fact that the Corps was not required to replace water supply lost as a result of the integrity problems of the Dike. It is a reasonable way to reflect the fact that the integrity problems of the Dike (which caused the 500,000 acre-feet loss of water supply between 2000 and 2008) were caused by weather conditions and not by actions of the Corps which constitute an "implementation of the Plan."

The Plaintiffs rely heavily on the following provisions of 33 C.F.R. § 385.36(a):

> The Corps of Engineers and the non-Federal sponsor shall determine if implementation of the project will cause an elimination or transfer of existing legal sources of water by comparing the availability of water with the recommended project with the pre-CERP baseline developed in accordance with § 385.35(a), by using the water quality and other analyses developed in § 385.35(a)(1)(iii), and by using other appropriate information.

33 C.F.R. § 385.36(a). Plaintiffs point out that the definition of "pre-CERP baseline" is provided in 33 C.F.R. § 385.3 to mean

---

intervening non-CERP activities was simply activities that do not constitute actions by the Corps in "implement[ing] the Plan." And because the Corps' replacement obligation under the Savings Clause requires the Corps to replace *only* losses of water supply caused by actions of the Corps in "implement[ing] the Plan," the Corps had no obligation to replace the losses of water supply reflected in LORS 2008.

"hydrologic conditions in the South Florida ecosystem on the date of enactment of WRDA 2000 . . . using . . . assumed operations of the Central and Southern Florida Project." And Plaintiffs point out that the WSE regulation schedule was the "assumed operations" at that time, which, they argue, means that the WSE Lake level of 18.53 feet should be the "pre-CERP baseline" referred to in the regulation.

However, as the district court pointed out, the sentences in § 385.36(a)—i.e. the ones immediately preceding the one Plaintiffs rely on—repeat the statutory language that limits the scope of the replacement obligation to water supply losses *caused* by "implementation of the Plan." Thus, the regulation Plaintiffs rely on is internally inconsistent. In any event, we agree with the district court that the plain language of the Savings Clause unambiguously limits the scope of the replacement obligation to water supply losses caused by "implementation[s] of the Plan." *See* WRDA 2000 § 601(h)(5)(A) ("Until a new source of water supply . . . is available *to replace the water to be lost as a result of implementation of the Plan*") (emphasis added). To the extent that provision of § 385.36(a) on which Plaintiffs rely is inconsistent with the unambiguous language of the statute, that provision has no effect. [19] *Josendis v. Wall to Wall*

_____

[19] The provision of the regulation upon which Plaintiffs rely is obviously not applicable to losses of water supply caused by acts of nature. Even Plaintiffs agree that the Corps' replacement obligation does not extend to replacing water supply lost as a result of acts of nature. We believe the same applies to other losses of water supply that are caused by events or actions that do not constitute actions of the Corps in "implement[ing] the Plan."

*Residence Repairs, Inc.*, 662 F.3d 1292, 1320 (11th Cir. 2011) ("Where the statutory language is clear, agency regulations have no effect.").

A primary reason Plaintiffs give to support their position that the Corps erroneously used LORS 2008 as the baseline for its Savings Clause analysis is that LORS 2008 was always intended to be temporary, pending completion of repairs to the Dike or the issuance of a new regulation schedule. Although the record bears out Plaintiffs' suggestion that LORS 2008 was intended to be temporary, Plaintiffs' argument fails because Plaintiffs do not explain why that suggests that the Corps erred in using LORS 2008 as the baseline in the Savings Clause analysis supporting its May 2020 approval of the EAA Project. Moreover, Plaintiffs make no argument, and point to no evidence that the repairs to the Dike have resulted in structural integrity of the Dike so as to safely accommodate the 18.53 feet maximum Lake level which they seek, or, indeed, to safely accommodate any increased Lake level above the 17.25 feet provided for in LORS 2008.[20]

For the foregoing reasons, we affirm the district court's holding with respect to the merits of Plaintiffs' first claim (the Savings Clause issue and the proper baseline issue with respect to the EAA Project). We hold that the Corps did not violate the Savings Clause

---

[20] We decline to address Plaintiffs' vague suggestion that—when and if the repairs to the Dike are completed and appropriate evaluation establishes that the Lake could safely accommodate the 18.53-foot maximum Lake level that Plaintiffs seek—at that future time, the Savings Clause should be interpreted to require the Corps to use the year 2000 baseline that Plaintiffs seek.

when it approved and authorized the EAA Project using the LORS 2008 baseline.

### VI. MERITS OF PLAINTIFFS' THIRD CLAIM—I.E. PLAINTIFFS' CLAIM THAT THE CORPS VIOLATED NEPA

Plaintiffs argue that the Corps violated NEPA when it failed to include the standalone operation of the STA in its Final EIS. They also argue that to the extent that the Corps intends to do a separate NEPA analysis, that would violate the NEPA anti-segmentation rules.

NEPA establishes a "national policy [to] encourage productive and enjoyable harmony between man and his environment," and was intended to reduce or eliminate environmental damage and to promote "the understanding of the ecological systems and natural resources important to" the United States. 42 U.S.C. § 4321. To accomplish that goal, NEPA requires that federal agencies consider in an EIS the environmental effects of proposed major actions, which include actions that an agency permits. *Id.* § 4332(2)(C). NEPA is "essentially procedural," designed to ensure "fully informed and well-considered decision[s]" by federal agencies. *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978). "'NEPA itself does not mandate particular results' in order to accomplish [its] ends." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756 (2004) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)). But instead, "NEPA imposes only procedural requirements on federal agencies with a particular focus on

23-11683                Opinion of the Court                47

requiring agencies to undertake analyses of the environmental impact of their proposals and actions." *Id.* at 756–57.

Under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), we will only set aside the Corps' NEPA analysis as unlawful if it is arbitrary, capricious, or an abuse of discretion. *Pres. Endangered Areas of Cobb's History, Inc., v. U.S. Army Corps of Engineers*, 87 F.3d 1242, 1246 (11th Cir. 1996). "This standard requires substantial deference to the agency, not only when reviewing decisions like what evidence to find credible and whether to issue a[n] . . . EIS, but also when reviewing drafting decisions like how much discussion to include on each topic, and how much data is necessary to fully address each issue." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1361 (11th Cir. 2008).

An agency cannot "'evade its responsibilities' under the National Environmental Policy Act by 'artificially dividing a major federal action into smaller components, each without a "significant" impact.'" *Pres. Endangered Areas*, 87 F.3d at 1247 (alteration accepted) (quoting *Coalition on Sensible Transportation, Inc. v. Dole*, 826 F.2d 60, 68 (D.C. Cir. 1987)). We have stated that "[t]he rule against segmentation for EIS purposes is not an imperative to be applied in every case." *Sierra Club v. Callaway*, 499 F.2d 982, 987 (5th Cir. 1974).[21] Among the factors we consider when determining

---

[21] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

whether to apply the segmentation rule is whether the project has independent utility. *Id.* The *Callaway* court listed numerous reasons why the small Wallisville Project had significant importance and utility wholly independent of the larger Trinity Project, *see id.* at 988, and thus was a "separate and viable entity" so that there was no violation of NEPA when the Corps' EIS examined the Wallisville Project as a separate project, separate from the larger Trinity Project, *id.* at 990. We elaborated in *Piedmont Heights Civic Club, Inc. v. Moreland*, 637 F.2d 430 (5th Cir. Unit B 1981):

> [T]he rule against segmentation is not required to be applied in every situation. To determine the appropriate scope for an EIS courts have considered such factors as whether the proposed segment (1) has logical termini, (2) has substantial independent utility, (3) does not foreclose the opportunity to consider alternatives, and (4) does not irretrievably commit federal funds for closely related projects.

*Id.* at 439. We have held: "the independent utility factor is by far the most important." *Pres. Endangered Areas*, 87 F.3d at 1247 (internal quotation omitted); *see also Piedmont Heights*, 637 F.2d at 440 (referring to the independent utility inquiry as the crucial inquiry); *id.* at 441 (holding that "because of the independent utility of the projects," they were not improperly segmented).

In this case, it is clear that the standalone operation of the STA has independent utility, and therefore the contemplated

supplemental EIS to evaluate the environmental effects of the standalone operation of the STA will not constitute an improper segmentation. As discussed above, the STA is designed to clean the water by removing phosphorous and addressing other water quality concerns, as well as providing fresh water to the Everglades. Although originally designed to operate in tandem with the proposed Reservoir, if the STA is operated notwithstanding the delays with respect to the Reservoir, the STA would still purify the water to be released to the Everglades—it would still fully serve its original purpose. Indeed, standalone STA operation would still contribute directly toward the Plan's broader objective of "restor[ing], preserv[ing], and protect[ing] the South Florida ecosystem." Pub. L. No. 106-541, § 601(b)(1)(A); *cf. Piedmont Heights*, 637 F.2d at 441 (determining that public transit station projects each had independent utility because each "individually contribute[d] to alleviation of the traffic problems in Atlanta"). Moreover, the other relevant factors reinforce the independent utility of the STA, and that there is nothing inappropriate with respect to NEPA analysis thereof occurring in a supplemental EIS. Its standalone operation does not irretrievably commit federal funds or limit future projects.[22]

The Corps' approach in this case—i.e. conducting the NEPA analysis, the EIS, on the overall EAA Project as originally designed with the Reservoir and STA operating in tandem, and conducting a supplemental EIS when delays with respect to the Reservoir

---

[22] The logical termini factor is relevant in the context of segments of highway or rail projects, but not here.

suggest it might be feasible to conduct a standalone operation of the STA—is entirely consistent with the underlying purpose of the anti-segmentation principles. That underlying purpose "prevent[s] agencies from dividing one project into multiple individual actions each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1314 (D.C. Cir. 2014) (alteration in original) (internal quotation and citation omitted). In other words, the purpose is to avoid overlooking cumulative effects. In this case, the cumulative effects have already been considered in the EIS evaluation of the entire EAA Project. Additional effects, if any, will be evaluated in a supplemental EIS before the occurrence of any standalone operation of the STA.

In sum, there is no likelihood in this case that the purpose of the anti-segmentation principle would be contravened if and when standalone operation of the STA occurs. There is no likelihood that adverse effects thereof would escape detection. Indeed, Plaintiffs have not pointed to any likely adverse effects, and our careful review of the record has revealed none. "The record is barren . . . of any facts that would suggest that such a danger exists" in this case. *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 299 (D.C. Cir. 1987).

For all of the above reasons, the Corps also did not abuse its discretion, or act arbitrarily or capriciously, when it failed to include the standalone operation of the STA in its Final EIS. As noted above, the standalone operation of the STA has independent utility,

making it an appropriate subject of a separate, supplemental EIS. And, as noted above, there is no likelihood in this case that any cumulative adverse effects of the standalone operation of the STA will go undetected or unevaluated.

Because the Corps did not abuse its discretion or act arbitrarily or capriciously when it failed to include the standalone operation of the STA in its Final EIS or when it performs such analysis separately, we reject the Plaintiffs' segmentation challenges to the Corps' NEPA analysis. With respect to this third claim of the Plaintiffs, we affirm the district court.


## VII. CONCLUSION

With respect to Plaintiffs' first claim, we affirm the district court, both with respect to its holding on standing and on the merits. With respect to standing, as explained in Part IV.A., we agree with the district court that the Corps' challenge to the standing of the Plaintiffs to bring their first claim fatally conflated the standing inquiry with the merits inquiry; with respect to their first claim, and accepting the validity of the merits of Plaintiffs' claim, the Plaintiffs would suffer an injury-in-fact. We also agree with the district court that, with respect to their first claim, the Plaintiffs have satisfied the other standing requirements. We also affirm the district court's holding with respect to the merits of Plaintiffs' first claim. As explained in Part V., we agree with the district court that the Corps did not violate the Savings Clause when it approved and authorized the EAA Project using the LORS 2008 baseline.

With respect to Plaintiffs' second claim, as explained in Parts IV.B. and IV.B.1., we hold that the district court erred in failing to recognize that Plaintiffs' second claim was not ripe; to this extent, the judgment of the district court is reversed and remanded. We instruct the district court on remand to dismiss Plaintiffs' second claim for lack of finality and ripeness.

With respect to Plaintiffs' third claim, as explained in Parts IV.B and IV.B.2, the claim is ripe. And as explained in Part VI, on the merits of Plaintiffs' third claim, we agree with the district court that the Corps did not violate NEPA. Thus, we affirm the district court with respect to Plaintiffs' third claim.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED WITH INSTRUCTIONS.